**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **MAINE COMMUNITY HEALTH OPTIONS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 16-967C** |
| | ) | |
| **v.** | ) | |
| | ) | **Judge Eric G. Bruggink** |
| **THE UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DEFENDANT'S MOTION TO DISMISS AND**
**OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

RUTH A. HARVEY
Director
Commercial Litigation Branch

KIRK T. MANHARDT
Deputy Director

/s/ Serena M. Orloff
SERENA M. ORLOFF
MARC S. SACKS
CHARLES E. CANTER
TERRANCE A. MEBANE
FRANCES M. MCLAUGHLIN
L. MISHA PREHEIM
PHILLIP M. SELIGMAN
Commercial Litigation Branch
Civil Division
United States Department of Justice

ATTORNEYS FOR THE UNITED STATES

Dated: January 13, 2017

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........................................ iii

**INTRODUCTION** ........................................ 1

**STATEMENT OF THE ISSUES** ........................................ 3

**STATEMENT OF THE CASE** ........................................ 3

I. In 2010, Congress Enacted the Risk Corridors Program as Part of the Affordable Care Act ........................................ 3

A. The Health Benefit Exchanges ........................................ 4

B. The Risk Corridors Program ........................................ 5

II. In Early 2014, HHS Announced that It Would Implement the Risk Corridors Program in a Budget-Neutral Manner within a Three-Year Framework ........................................ 7

III. For Fiscal Years 2015 and 2016, Congress Enacted Appropriations Riders Limiting the Total Risk Corridors Payments to the Amount of Risk Corridors Collections ........................................ 10

IV. In Conformity with Its Three-Year Administrative Framework and the Appropriations Riders, HHS Applied a Pro-Rata Reduction to Risk Corridors Payments in the First Payment Cycle ........................................ 13

**ARGUMENT** ........................................ 14

I. The Court Lacks Jurisdiction Under the Tucker Act Because CHO Has No Substantive Right to "Presently Due Money Damages" ........................................ 14

A. The Tucker Act's Waiver of Sovereign Immunity Is Limited to Monetary Claims That Are "Presently Due" ........................................ 15

B. Additional Risk Corridors Payments Are Not Presently Due ........................................ 16

1. Congress Did Not Require Annual Payments ........................................ 16

2. Because HHS's Three-Year Framework Is Reasonable, Additional Payments Are Not Presently Due ........................................ 19

II. CHO's Claims Are Not Ripe ........................................ 27

III. If the Court Reaches the Merits, the Case Should Be Dismissed, and CHO's Motion for Summary Judgment Denied, Because CHO Fails to State a Claim upon Which Relief Can Be Granted ........................................ 30

A. The ACA Does Not Mandate Risk Corridors Payments In Excess of Amounts Collected ........................................ 29

B. Congress's Post-ACA Enactments Confirm That Insurers Do Not Have an Entitlement to Risk Corridors Payments In Excess of Collections ........................................ 34

C. Congress Could Limit the United States' Liability Through Appropriations Restrictions Because the Risk Corridors Program Does Not Impose Contractual Obligations on the United States ..... 41

**CONCLUSION** ..... 42

# TABLE OF AUTHORITIES

**Cases**

*American Fed'n of Gov't Employees, AFL–CIO v. Campbell*,
659 F.2d 157 (D.C. Cir. 1980) ........ 37

*Annuity Transfers, Ltd. v. United States*,
86 Fed. Cl. 173 (2009) ........ 14, 16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 29

*Balelo v. Baldrige*,
724 F.2d 753 (9th Cir. 1984) ........ 35

*Barlow & Haun, Inc. v. United States*,
118 Fed. Cl. 597 (2014) ........ 27

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 29

*Bickford v. United States*,
228 Ct. Cl. 321 (1981) ........ 35

*Blanchette v. Connecticut Gen. Ins. Corps.*,
419 U.S. 102 (1974) ........ 40

*Burtch v. United States Dep't of the Treasury*,
120 F.3d 1087 (9th Cir. 1997) ........ 38

*Cambridge v. United States*,
558 F.3d 1331 (Fed. Cir. 2009) ........ 30

*Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*,
400 F.3d 1352 (Fed. Cir. 2005) ........ 19

*Cherokee Nation of Oklahoma v. Leavitt*,
543 U.S. 631 (2005) ........ 41

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ........ 19, 24, 25

*City of Arcata v. Slater*,
133 F.3d 926, 1997 WL 812258 (9th Cir. 1997) ........ 37

*Cobell v. Norton*,
428 F.3d 1070 (D.C. Cir. 2005)........................................................................................ 20

*Contreras v. United States*,
64 Fed. Cl. 583 (2005)..................................................................................................... 17

*CW Gov't Travel, Inc. v. United States*,
46 Fed. Cl. 554 (2000)..................................................................................................... 28

*Dept. of Army v. Blue Fox, Inc.*,
525 U.S. 255 (1999) ........................................................................................................ 15

*Envirocare of Utah Inc. v. United States*,
44 Fed. Cl. 474 (1999)..................................................................................................... 36

*Gibney v. United States*,
114 Ct. Cl. 38 (1949)....................................................................................................... 40

*Gonzales v. Oregon*,
546 U.S. 243 (2006) ........................................................................................................ 22

*Greenlee Cty. v. United States*,
487 F.3d 871 (Fed. Cir. 2007) ................................................................................... 39, 41

*Health Republic Ins. Co. v. United States*,
No. 16-259C, 2017 WL 83818 (Fed. Cl. Jan. 10, 2017) .................................................. 18

*Highland Falls–Fort Montgomery Cent. Sch. Dist. v. United States*,
48 F.3d 1166 (Fed. Cir. 1995) ............................................................................. 37, 39, 40

*Johnson v. United States*,
105 Fed. Cl. 85 (2012)..................................................................................................... 16

*Kennedy for President Comm. v. FCC*,
636 F.2d 432, 453-54 (D.C. Cir. 1980) ............................................................................ 35

*King v. Burwell*,
135 S. Ct. 2480 (2015)................................................................................................. 3, 23

*Kizas v. Webster*,
707 F.2d 524 (D.C. Cir. 1983).......................................................................................... 42

*Land of Lincoln Mut. Health Ins. Co. v. United States*,
129 Fed. Cl. 81 (2016)............................................................................................. *passim*

*Landgraf v. USI Film Prod.*,
511 U.S. 244 (1994) ........................................................................................................ 39

*Lane v. Pena*,
518 U.S. 187 (1996) .......... 15

*Lindsay v. United States*,
295 F.3d 1252 (Fed. Cir. 2002) .......... 30

*Matthews v. United States*,
123 U.S. 182 (1887) .......... 37

*Ex parte McCardle*,
74 U.S. (7 Wall.) 506 (1868) .......... 14

*McCarthy v. Madigan*,
503 U.S. 140 (1992) .......... 19

*Meyers v. United States*,
96 Fed. Cl. 34 (2010) .......... 17

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
132 S. Ct. 2566 (2012) .......... 32

*New York Airways, Inc. v. United States*,
369 F.2d 743 (Ct. Cl. 1966) .......... 40

*Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency*,
373 F.3d 1251 (D.C. Cir. 2004) .......... 22

*Office of Personnel Management v. Richmond*,
496 U.S. 414 (1990) .......... 24

*Order of Ry. Conductors of Am. v. Swan*,
329 U.S. 520 (1947) .......... 35

*Overall Roofing & Const. Inc. v. United States*,
929 F.2d 687 (Fed. Cir. 1991) .......... 16

*Prairie Cty. Mont. v. United States*,
113 Fed. Cl. 194 (2013) .......... 40, 42

*Pension Benefit Guaranty Corp. v. LTV Corp.*,
496 U.S. 633 (1990) .......... 35

*Republic Airlines, Inc. v. U.S. Dep't of Transp.*,
849 F.2d 1315 (10th Cir. 1988) .......... 35, 37

*Richardson v. Belcher*,
404 U.S. 78 (1971) .......... 42

*Rothe Dev. Corp. v. Dep't of, Def.*, 413 F.3d 1327 (Fed. Cir. 2005) .......... 28

*Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181 (2012) .......... 41

*Sharp v. United States*, 580 F.3d 1234 (Fed. Cir. 2009) .......... 33

*Shinnecock Indian Nation v. United States*, 782 F.3d 1345 (Fed. Cir. 2015) .......... 27, 28

*Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568 (1985) .......... 28

*Todd v. United States*, 386 F.3d 1091 (Fed. Cir. 2004) .......... 15

*United States v. Dickerson*, 310 U.S. 554 (1940) .......... 35, 38, 40

*United States v. King*, 395 U.S. 1 (1969) .......... 15, 27

*United States v. Langston*, 118 U.S. 389 (1886) .......... 39

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .......... 19, 24

*United States v. Mitchell*, 109 U.S. 146 (1883) .......... 37

*United States v. Mitchell*, 463 U.S. 206 (1983) .......... 15

*United States v. Sherwood*, 312 U.S. 584 (1941) .......... 15

*United States v. Testan*, 424 U.S. 392 (1976) .......... 15, 27

*United States v. Will*, 449 U.S. 200 (1980) .......... 36, 37

*United States v. Wrigley*, 520 F.2d 362 (8th Cir. 1975) .......... 35

*Usery v. Turner Elkhorn Mining Co.*,
428 U.S. 1 (1976) ........ 41

*W.E. Partners II, LLC v. United States*,
119 Fed. Cl. 684 (2015) ........ 17

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) ........ 28

*Widtfeldt v. United States*,
122 Fed. Cl. 158 (2015) ........ 14

*Y.S.K. Const. Co. v. United States*,
30 Fed. Cl. 449 (1994) ........ 17

**Statutes**

5 U.S.C. § 5101 ........ 27

26 U.S.C. § 104(a)(4) ........ 27

28 U.S.C. § 1491(a)(1) ........ 15

31 U.S.C. § 1501 ........ 25

42 U.S.C. § 300gg ........ 4, 5

42 U.S.C. § 1395w-115(a) ........ 7, 22

42 U.S.C. § 1395w-115(a)(2) ........ 32

42 U.S.C. § 1395w-115(d) ........ 22

42 U.S.C. § 1395w-115(e)(3) ........ 21

42 U.S.C. § 1395w-116(c)(3) ........ 7, 22

42 U.S.C. § 18001 ........ 31

42 U.S.C. § 18021 ........ 5

42 U.S.C. § 18031 ........ 4

42 U.S.C. § 18041 ........ 3, 4

42 U.S.C. § 18061 ........ 6, 17

42 U.S.C. § 18062 ..... *passim*

42 U.S.C. § 18063 ..... 6, 17

42 U.S.C. § 18071 ..... 4

Pub. L. No. 97-102 ..... 36

Pub. L. No. 104-134 ..... 19

Pub. L. No. 102-572 ..... 16

Pub. L. No. 111-148 ..... 3, 12, 31, 32

Pub. L. No. 113-235 ..... 11, 34

Pub. L. No. 114-100 ..... 13

Pub. L. No. 114-113 ..... 12, 34

Pub. L. No. 114-223 ..... 13

Pub. L. No. 114-254 ..... 13

Pub. L. No. 114-53 § 101(a) ..... 13

Pub. L. No. 114-96 ..... 13

**Regulations**

42 C.F.R. § 423.336(c) ..... 22

45 C.F.R. § 147.110 ..... 5

45 C.F.R. § 153.20 ..... 7

45 C.F.R. § 153.500 ..... 6, 7

45 C.F.R. § 153.510 ..... *passim*

45 C.F.R. § 153.530 ..... 7, 14

45 C.F.R. part 155 ..... 5

45 C.F.R. § 155.20 ..... 4, 5

45 C.F.R. § 155.105 ..... 4

45 C.F.R. part 156 .......... 5

**Federal Register**

Standards Related to Reinsurance, Risk Corridors and Risk Adjustment,
76 Fed. Reg. 41,930 (July 15, 2011) .......... 8

HHS Notice of Benefit and Payment Parameters,
78 Fed. Reg. 15,410 (March 11, 2013) .......... 7

Program Integrity; Exchange, SHOP, and Eligibility Appeals,
78 Fed. Reg. 54,070 (Aug. 30, 2013) .......... 4

HHS Notice of Benefit and Payment Parameters for 2015 Final Rule,
79 Fed. Reg. 13,744 (Mar. 11, 2014) .......... 8, 33

Exchange and Insurance Market Standards for 2015 and Beyond Proposed Rule,
79 Fed. Reg. 15,808 (Mar. 21, 2014) .......... 8

Exchange and Insurance Market Standards for 2015 and Beyond Final Rule,
79 Fed. Reg. 30,240 (May 27, 2014) .......... 9, 24, 34

HHS Notice of Benefit and Payment Parameters for 2016,
80 Fed. Reg. 10,750 (Feb. 27, 2015) .......... 9, 26

**Rules**

RCFC 12(b)(1) .......... 1, 14

RCFC 12(b)(6) .......... *passsim*

RCFC 12(h)(3) .......... 14

**Miscellaneous**

The Honorable Jeff Sessions, the Honorable Fred Upton, B-325630 (Comp. Gen.)
2014 WL 4825237 (Sept. 30, 2014) .......... 10, 31, 34

160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014) .......... 12, 20, 23, 34

S. Rep. No. 114-74 (2015) .......... 12, 35

Principles of Federal Appropriations Law (GAO Redbook) (Vol. I) (4th ed. 2016) .......... 25, 35

Principles of Federal Appropriations Law (GAO Redbook) (Vol. II) (3d ed. 2004) .......... 25

*To the Adm'r, Veterans Admin.*, 39 Comp. Gen. 422, 424 (Dec. 4, 1959) .......... 25

Pursuant to Rule 12(b)(1) of this Court's rules ("RCFC"), defendant, the United States, moves the Court to dismiss the Complaint of Maine Community Health Options ("CHO") for lack of subject matter jurisdiction. Should the Court determine that it has jurisdiction over CHO's claim, the United States moves for dismissal under Rule 12(b)(6). As CHO concedes in its motion for summary judgment ("Pl.'s Motion") (Dkt. 9) that "[t]his case presents a pure question of statutory interpretation," Pl.'s Motion at 22, this memorandum of law also serves as the United States' opposition to CHO's Motion.[1] This case should be resolved on the United States' motion to dismiss. If, however, the Court chooses to resolve on summary judgment, then the Court should deny CHO's Motion and enter judgment in favor of the United States for the reasons set forth in this motion.

## INTRODUCTION

CHO brings this case seeking payments under section 1342 of the Affordable Care Act, 42 U.S.C. § 18062. Section 1342 directs HHS to establish and administer a three-year premium stabilization program known as "risk corridors" under which qualifying health plans either pay money to or receive money from HHS based on the ratio of their premiums to claims costs. CHO participated in the program in 2014 and 2015 and claims to be entitled to more than $22 million in payments for those two years, but has received only a portion of the amount alleged to be due. CHO seeks relief in this Court, but its claims fail as a matter of law.

---

[1] For the same reason, the United States does not separately respond to CHO's statement of undisputed material facts. Pl.'s Motion at 13-18. While CHO selectively quotes from the Federal Register and documents produced by the Secretary of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS"), *see* Pl.'s Motion & Addendum, the United States does not contest the existence of those documents, which speak for themselves. The United States' motion addresses many of those documents, putting them in context.

First, CHO has no claim to "presently due" money damages, as it must to establish jurisdiction under the Tucker Act. Section 1342 does not provide a deadline by which risk corridors payments must be made, and HHS, as administrator of the program, established a three-year payment framework under which it operates the program in a budget neutral manner by making payments for any particular benefit year from charges collected across all three years of the program's life span. Under this framework, HHS does not owe CHO, or any other issuer, final payment before the end of the program.

Second, CHO's claims are not ripe. Because HHS's three-year framework has not yet run its course, HHS has not determined the total amount of risk corridors payments any issuer will receive. Upon the conclusion of the three-year program, CHO may receive the full amount of its claims. Even if it does not, it almost certainly will receive additional amounts. Because the final payment amounts are unknown and cannot be determined at this time, CHO's claims are not justiciable.

Third, CHO's claim fails on the merits. "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Congress did not appropriate money or authorize appropriations for risk corridors payments when it enacted section 1342 in 2010, demonstrating its understanding that the program would be funded solely from risk corridors collections. And even if that intent were unclear when the Affordable Care Act was enacted in 2010, Congress removed any ambiguity when it enacted annual appropriations laws for fiscal years 2015 through the present (the "Spending Laws") that prohibit HHS from paying risk corridors amounts from appropriated funds other than collections. Congress's intent in restricting those funds is clear: the risk corridors program must be budget

neutral for the years the Spending Laws are in effect. Because this clear congressional intent is dispositive of all issues before the Court, the case should be dismissed.

## STATEMENT OF THE ISSUES

1. Whether, as required by the Tucker Act, CHO has an entitlement to "presently due money damages" under a government program that does not require final payment before the end of the three-year program.

2. Whether CHO's claims for full payment are ripe for review before a final agency determination of how much will be paid.

3. Whether, on the merits, CHO can receive payments in excess of collections under section 1342 notwithstanding congressional intent that risk corridors payments be funded solely from collections over the program's three year life-span.

## STATEMENT OF THE CASE

### I. In 2010, Congress Enacted the Risk Corridors Program as Part of the Affordable Care Act

In 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (March 23, 2010) (the "ACA"), seeking to guarantee the availability of affordable, high-quality health insurance coverage for all Americans. *King v. Burwell*, 135 S. Ct. 2480, 2485 (2015).[2] The Act's key reforms are threefold: (1) it prohibits health insurance companies from denying coverage or setting premiums based upon health status or medical

[2] HHS is responsible for overseeing implementation of major provisions of the ACA and for administering certain programs under the ACA, either directly or in conjunction with other federal agencies and/or states. *See, e.g.*, 42 U.S.C. §§ 18041(a)(1)(A), (c)(1). HHS delegates many of its responsibilities under the ACA to CMS, which created the Center for Consumer Information and Insurance Oversight ("CCIIO") to oversee implementation of the ACA. HHS, CMS, and CCIIO are referred to in this motion as "HHS."

history; (2) it requires individuals to maintain health insurance coverage or make a payment to the Internal Revenue Service; and (3) it provides federal insurance subsidies in the form of premium tax credits and cost sharing reductions to make insurance more affordable to eligible consumers. *King*, 135 S. Ct. at 2486 (citing 42 U.S.C. §§ 300gg, 300gg–1(a), 18081, 18082, 18091; 26 U.S.C. §§ 5000A, & 36B); *see also* 42 U.S.C. § 18071.

**A. The Health Benefit Exchanges**

To implement these reforms, the Act created Health Benefit Exchanges ("Exchanges"), virtual marketplaces in each state where individuals and small groups can purchase health insurance coverage. 42 U.S.C. §§ 18031-18041. For consumers, the Exchanges provide a centralized location to shop for, select, and enroll in qualified health plans. Exchanges also are the only forum in which eligible consumers can purchase coverage with the assistance of federal subsidies. For issuers, the Exchanges provide organized, competitive marketplaces to compete for business in a centralized location, and they are the only commercial channel in which issuers can market their plans to the millions of individuals who receive federal insurance subsidies. The Exchanges also perform certain administrative functions, including eligibility verification, enrollment, and the delivery of federal insurance subsidies.

The Act contemplated that states would operate their own Exchanges ("State-Based Exchange") but provided that HHS would establish and operate Exchanges for any state that elected not to do so ("Federally-facilitated Exchange"). *See* 42 U.S.C. § 18041; 45 C.F.R. §§ 155.20, 155.105; Program Integrity; Exchange, SHOP, and Eligibility Appeals, 78 Fed. Reg. 54,070, 54,071 (Aug. 30, 2013).[3] All plans offered through an Exchange—whether State-Based

[3] States have three options regarding the establishment and administration of an Exchange: (1)

or Federally-facilitated—must be "Qualified Health Plans" ("QHPs"), meaning that they provide "essential health benefits" and comply with other regulatory parameters such as provider network requirements, benefit design rules, and cost sharing limitations. *See* 42 U.S.C. § 18021; 45 C.F.R. parts 155 and 156.

**B. The Risk Corridors Program**

The ACA introduced millions of previously uninsured individuals into the insurance markets. The entry of these individuals created valuable business opportunities for health insurance companies electing to sell plans on the Exchanges. *See, e.g.*, Milliman, Ten Critical Considerations for Health Insurance Plans Evaluating Participation in Public Exchange Markets (Dec. 2012) (noting "an expectation of expansive consumer participation in the exchange providing additional market opportunities" and that "the opportunity to reach a new market by participating in the exchange land grab could be a very quick way to increase the size of an insurer's covered population."), Appendix at A43, A49. Nevertheless, with that business opportunity came pricing uncertainty arising from the unknown health status of an expanded risk pool and the fact that insurers could no longer charge higher premiums or deny coverage based on an enrollee's health. *See* 42 U.S.C. §§ 300gg, 300gg-1; 45 C.F.R. §§ 147.104-147.110. To mitigate the pricing risk and incentives for adverse selection arising from these changes, the Act established three premium stabilization programs modeled on similar programs established under the Medicare Program. *See* Compl. ¶¶ 7-9, 31. Informally known as the "3Rs," these programs

---

they can elect to run their own Exchange using a state or federally-maintained information technology platform ("State-Based Exchange"); (2) they can let the federal government run their Exchange ("Federally-facilitated Exchange"); or (3) they can partner with the federal government to jointly administer their Exchange ("State Partnership Exchange"). 45 C.F.R. §§ 155.20; 155.105, 155.106, 155.200. HHS uses the term Federally-facilitated Exchanges to include State Partnership Exchanges.

began with the 2014 benefit year and consist of reinsurance, risk adjustment, and risk corridors. *See generally* 42 U.S.C. §§ 18061-18063.

The 3Rs program at issue in this case is the temporary risk corridors program established under section 1342 of the ACA, which seeks to reduce financial uncertainty for QHP issuers during the initial years of the Act by limiting financial losses and gains resulting from inaccurate rate-setting. *See* Compl. ¶¶ 7, 9, 34. To do this, section 1342 requires the Secretary of HHS to "establish and administer a program of risk corridors" under which issuers offering individual and small group QHPs between 2014 and 2016 "shall participate in a payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums." 42 U.S.C. § 18062(a). Under the "payment methodology" set forth in the ACA, if an issuer's "allowable costs" (essentially, claims costs) are less than a "target amount" (premiums minus allowable administrative costs) by more than three percent, the plan must pay a percentage of the difference (referred to here as a "charge" or "collection") to HHS. 42 U.S.C. § 18062(b)(2).[4] Conversely, if an issuer's allowable costs exceed the target amount by more than three percent, the issuer receives a percentage of the difference (referred to as a "payment"). 42 U.S.C. § 18062(b)(1). The payment and charge percentage is set by statute: either 50% or 80%, depending on the degree of loss or gain realized by the issuer. 42 U.S.C. § 18062(b). HHS regulations incorporate this payment methodology in substantially similar terms. *See* 45 C.F.R. § 153.510(b)-(c).

---

[4] "Allowable administrative costs" include profits of up to three percent subject to an overall cap. *See* 45 C.F.R. § 153.500.

All QHP issuers are statutorily required to participate in the risk corridors program,[5] which HHS administers through regulations and guidance. Under the regulations, after the close of each benefit year, issuers of QHPs must compile and submit premium and cost data and other information underlying their risk corridors calculations to HHS no later than July 31 of the next calendar year. 45 C.F.R. § 153.530(d). Using these data, HHS calculates the charges and payments due to and from each issuer for the preceding benefit year. *See* 45 C.F.R. § 153.530(a)-(c); HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15,410, 15,473-74 (March 11, 2013). Within 30 days of HHS's announcement of final charge amounts, issuers are required to remit payment to HHS. 45 C.F.R. § 153.510(d). Neither the ACA nor the implementing regulations set a deadline by which HHS must make payments to issuers. *See generally* 42 U.S.C. § 18062; 45 C.F.R. § 153.510.

## II. In Early 2014, HHS Announced that It Would Implement the Risk Corridors Program in a Budget-Neutral Manner within a Three-Year Framework

Although Congress appropriated funds in the ACA for many programs and authorized funding for others, Congress did not include in the ACA either an appropriation or an authorization of funding for risk corridors. The absence of such a provision sets the ACA risk corridors program apart from the risk corridors program under Medicare Part D, which expressly authorizes the appropriation of "moneys in the Treasury" for Part D payments. 42 U.S.C. § 1395w-116(c)(3); *see also* 42 U.S.C. § 1395w-115(a) ("This section constitutes budget authority in advance of appropriations Acts . . . for the payment of amounts provided under this section.").

---

[5] With respect to the risk corridors program, the term QHP is defined at 45 C.F.R. § 153.500 to include health plans offered outside the Exchanges that are the same plan or substantially the same as a QHP offered on the Exchanges, as defined at 45 C.F.R. § 153.20.

In July 2011, HHS published a proposed rule noting that when the Congressional Budget Office ("CBO") performed a cost estimate contemporaneously with ACA's passage, it "assumed [risk corridors] collections would equal payments to plans in the aggregate." Standards Related to Reinsurance, Risk Corridors and Risk Adjustment, 76 Fed. Reg. 41,930, 41,948 (July 15, 2011). In March 2012, HHS published a regulatory impact analysis again noting that "CBO . . . assumed collections would equal payments to plans and would therefore be budget neutral." Centers for Medicare & Medicaid Services, Regulatory Impact Analysis, Establishment of Exchanges and Qualified Health Plans, Exchange Standards for Employers (CMS-9989-FWP) and Standards Related to Reinsurance, Risk Corridors and Risk Adjustment (CMS-9975-F) (Mar. 16, 2012), Appendix at A150, A159; *see also* Centers for Medicare & Medicaid Services, Preliminary Regulatory Impact Analysis (CMS-9989-P2) (July 2011) ("CBO . . . assumed aggregate collections from some issuers would offset payments made to other issuers."), Appendix at A105, A135.

On March 11, 2014, HHS issued a final rule stating that "[w]e intend to implement th[e] [risk corridors] program in a budget neutral manner, and may make future adjustments, either upward or downward to this program . . . to the extent necessary to achieve this goal." HHS Notice of Benefit and Payment Parameters for 2015 Final Rule, 79 Fed. Reg. 13,744, 13,787 (Mar. 11, 2014); *see also id.* at 13,829 ("HHS intends to implement this program in a budget neutral manner."); Exchange and Insurance Market Standards for 2015 and Beyond Proposed Rule, 79 Fed. Reg. 15,808, 15,822 (Mar. 21, 2014) (same). On April 11, 2014, HHS released guidance explaining that, in order to implement budget neutrality, it would make risk corridors payments only to the extent of collections, and that any shortfall in collections would result in a

pro-rata reduction of all payments. Centers for Medicare & Medicaid Services, Risk Corridors and Budget Neutrality (Apr. 11, 2014) ("April 11 Guidance"), Appendix at A1. That shortfall would then be paid from collections in the second and (if necessary) third years of the program. *Id.* Under this three-year framework, in the event of a collections shortfall, final payments under the risk corridors program are not due until the end of the program. *Id.* HHS reiterated and expanded upon this guidance in final rules issued in May 2014 and February 2015. *See* Exchange and Insurance Market Standards for 2015 and Beyond Final Rule, 79 Fed. Reg. 30,240, 30,260 (May 27, 2014) (Pl.'s Motion Addendum A ("PA") (Dkt. 9-2) at 22); HHS Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. 10,750, 10,779 (Feb. 27, 2015) (PA at 25).

HHS did note, however, that although it would strive to achieve budget neutrality consistent with the CBO's projections, it interpreted section 1342 to require full payments to issuers and that, if necessary, at the conclusion of the program, it would use sources of funding other than risk corridors collections, subject to the availability of appropriations. *See, e.g.*, Exchange and Insurance Market Standards for 2015 and Beyond Final Rule, 79 Fed. Reg. at 30,260 ("HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers. In [the event that risk corridors collections are insufficient to fund payments over the three-year life of the program], HHS will use other sources of funding for the risk corridors payments, subject to the availability of appropriations.") (PA at 22); HHS Notice of Benefit and Payment Parameters for 2016 Final Rule, 80 Fed. Reg. at 10,779 ("HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers. In the unlikely event that risk corridors collections, including any potential carryover from the

prior years, are insufficient to make risk corridors payments for the 2016 program year, HHS will use other sources of funding for the risk corridors payments, subject to the availability of appropriations.") (PA at 25); HHS Notice of Benefit and Payment Parameters for 2014 Final Rule, 78 Fed. Reg. at 15,473 ("The risk corridors program is not statutorily required to be budget neutral. Regardless of the balance of payments and receipts, HHS will remit payments as required under section 1342 of the Affordable Care Act.") (PA at 13).[6]

## III. For Fiscal Years 2015 and 2016, Congress Enacted Appropriations Riders Limiting the Total Risk Corridors Payments to the Amount of Risk Corridors Collections

Meanwhile, in February 2014, Members of Congress asked the Government Accountability Office ("GAO") for an opinion regarding the availability of appropriations to HHS to make payments to QHPs under the risk corridors program. *See* The Honorable Jeff Sessions, the Honorable Fred Upton, B-325630 (Comp. Gen.), 2014 WL 4825237, at *1 (Sept. 30, 2014) ("*GAO Op.*"). Prior to issuing its opinion, the GAO solicited the views of HHS, which identified collections from insurance issuers as the only source of funding and explained that collections could be spent pursuant to a provision of the CMS Program Management appropriation pertaining to authorized user fees. Letter of May 20, 2014, Appendix at A3. Shortly thereafter Members of Congress sent a similar inquiry to HHS regarding available budget authority to make risk corridors payments, and HHS again identified collections from

[6] Similarly, on September 9, 2016, HHS issued guidance stating, "As we have said previously, in the event of a shortfall for the 2016 benefit year, HHS will explore other sources of funding for risk corridors payments, subject to the availability of appropriations. This includes working with Congress on the necessary funding for outstanding risk corridors payments. HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers. HHS will record risk corridors payments due as an obligation of the United States Government for which full payment is required." Centers for Medicare & Medicaid Services, Risk Corridors Payments for 2015 (Sept. 9, 2016), Appendix at A39 (PA at 34); *compare* April 11 Guidance.

insurance issuers as the only source of funding for risk corridor payments. Letter of June 18, 2014, Appendix at A6.

In its opinion released on September 30, 2014, the GAO recognized that "Section 1342, by its terms, did not enact an appropriation to make the payments specified in section 1342(b)(1)," *GAO Op.*, 2014 WL 4825237, at *2. The GAO agreed with HHS that risk corridors collections could be used to make risk corridors payments under the user fee authority in CMS's Program Management appropriation. *Id.* at *4. The GAO also looked to whether any other funds were legally available to be spent on the risk corridors program and concluded that, in the annual appropriations law then in effect (the "2014 Spending Law"), a lump sum appropriation of $3.7 billion to be transferred from CMS trust funds to the CMS Program Management account for "other responsibilities of [CMS]" was sufficiently broad to cover risk corridors payments. *Id.* at *3. The opinion noted, however, that because risk corridors payments would not begin until fiscal year 2015 and "[a]ppropriations acts, by their nature, are considered nonpermanent legislation," similar appropriation language would need to be enacted in the fiscal year 2015 appropriations act and in subsequent fiscal year appropriations acts for the Program Management account to supply a source of funding for the program in those fiscal years. *Id.* at *5.

On December 9, 2014—months before any payments could be made under the risk corridors program—Congress passed the Consolidated and Further Continuing Appropriations Act, 2015 ("the 2015 Spending Law") specifically addressing budget authority for the risk corridors program. Like the 2014 Spending Law, the 2015 Spending Law provided a lump sum amount for CMS's Program Management account for fiscal year 2015 to be transferred from CMS trust funds. Pub. L. No. 113-235, div. G, title II. Unlike the 2014 Spending Law, however,

a rider to the 2015 Spending Law expressly limited the availability of Program Management funds for the risk corridors program, as follows:

> None of the funds made available by this Act from [CMS trust funds], or transferred from other accounts funded by this Act to the 'Centers for Medicare and Medicaid Services—Program Management' account, may be used for payments under section 1342(b)(1) of Public Law 111–148 (relating to risk corridors).

*Id.* § 227. The effect of the rider was to eliminate one of the two sources of available funding identified by the GAO, thereby limiting HHS's budget authority to make risk corridors payments to amounts derived from risk corridors collections. An accompanying Explanatory Statement indicated that the restriction was added "to prevent the CMS Program Management appropriation account from being used to support risk corridors payments." 160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014). The Explanatory Statement further observed that, "[i]n 2014, HHS issued a regulation stating that the risk corridor program will be budget neutral," and characterized that statement by HHS as "meaning that the federal government will never pay out more than it collects from issuers over the three year period risk corridors are in effect." *Id.*

On December 18, 2015, Congress enacted an identical funding limitation in the annual appropriations act for fiscal year 2016 (the "2016 Spending Law"). Pub. L. No. 114-113, div. H, title II, § 225. The Senate Committee Report to the 2016 Spending Law stated that the funding limitation "requir[es] the administration to operate the Risk Corridor program in a budget neutral manner by prohibiting any funds from the Labor-HHS-Education appropriations bill to be used as payments for the Risk Corridor program." Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriation Bill, 2016, S. Rep. No. 114-74, at

12 (2015).[7]

## IV. In Conformity with Its Three-Year Administrative Framework and the Appropriations Riders, HHS Applied a Pro-Rata Reduction to Risk Corridors Payments in the First Payment Cycle

On July 31, 2015, issuers submitted their risk corridors data for the 2014 benefit year pursuant to the schedule established by HHS. Centers for Medicare & Medicaid Services, Preliminary Risk Corridors Program Results (Aug. 7, 2015), Appendix at A41. On October 1, 2015, HHS announced that collections under the program for 2014 were expected to total $362 million, while payments calculated totaled $2.87 billion. Centers for Medicare & Medicaid Services, Risk Corridors Payment Proration Rate for 2014 (Oct. 1, 2015), Appendix at A42. HHS explained that, because payments exceeded collections, it could pay only 12.6% of these payments in the 2015 payment cycle. *Id.* Shortly thereafter, HHS released an individualized report of 2014 risk corridors charges and payments for each issuer. The same day, HHS released a guidance document explaining that it would make the pro-rated payments in late 2015, with "[t]he remaining 2014 risk corridors payments . . . made from 2015 risk corridors collections [in 2016], and if necessary, 2016 collections [in 2017]." Centers for Medicare & Medicaid Services, Risk Corridors Payments for the 2014 Benefit year (Nov. 19, 2015), Appendix at A8 ["November 19 Guidance"] (PA at 35). HHS also advised that, "[i]n the event of a shortfall for the 2016 program year, [HHS] will explore other sources of funding for risk corridors payments,

---

[7] The time period from September 30, 2015, (the expiration of the 2015 Spending Law) until the enactment of the 2016 Spending Law on December 18, 2015, is covered by continuing resolutions, which incorporate the rider in the 2015 Spending Law. *See* Pub. L. No. 114-53 § 101(a) (Sept. 30, 2015); Pub. L. No. 114-96 (Dec. 11, 2015); Pub. L. No. 114-100 (Dec. 16, 2015). Continuing resolutions enacted since the September 30, 2016 expiration of the 2016 Spending Law incorporate that law's rider as well. *See* Pub. L. No. 114-223, div. C (Sept. 29, 2016); Pub. L. No. 114-254 (Dec. 10, 2016).

subject to the availability of appropriations. This includes working with Congress on the necessary funding for outstanding risk corridors payments." *Id.*

In November 2015, HHS began collecting risk corridors charges for the 2014 benefit year. Centers for Medicare & Medicaid Services, Risk Corridors Payment and Charge Amounts for 2014 Benefit Year (Nov. 19, 2015), Appendix at A9. In December 2015, HHS began remitting risk corridors payments to issuers, including CHO. *Id.* Issuers submitted their benefit year 2015 risk corridors data to HHS by August 1, 2016. *See* 45 C.F.R. § 153.530(d). On November 18, 2016, HHS announced that it would pay additional risk corridors amounts toward 2014 benefit year payment requests based on collections for benefit year 2015. Centers for Medicare & Medicaid Services, Risk Corridors Payment and Charge Amounts for the 2015 Benefit Year (Nov. 18, 2016), Appendix at A87. HHS began paying those amounts in December 2016, consistent with its administrative guidance.

## ARGUMENT

### I. The Court Lacks Jurisdiction Under the Tucker Act Because CHO Has No Substantive Right to "Presently Due Money Damages"

A motion to dismiss for lack of subject matter jurisdiction is governed by RCFC 12(b)(1). When the movant challenges the jurisdictional facts alleged in the complaint, "[t]he plaintiff cannot rely solely on allegations in the complaint, but must bring forth relevant, adequate proof to establish jurisdiction." *Widtfeldt v. United States*, 122 Fed. Cl. 158, 162 (2015). The burden of proving that a court possesses subject matter jurisdiction lies at all times with the plaintiff. *Annuity Transfers, Ltd. v. United States*, 86 Fed. Cl. 173, 176-77 (2009). If a court determines that the plaintiff has not met its burden, the court "cannot proceed at all in any cause" and must dismiss the action. *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868); RCFC 12(h)(3).

### A. The Tucker Act's Waiver of Sovereign Immunity Is Limited to Monetary Claims That Are "Presently Due"

"The United States, as sovereign, is immune from suit save as it consents to be sued." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). A waiver of sovereign immunity is a necessary prerequisite to the exercise of jurisdiction over the United States by any court. *See, e.g., United States v. King*, 395 U.S. 1, 4 (1969). Such a waiver "must be unequivocally expressed in the statutory text" and "strictly construed, in terms of its scope," in favor of the United States. *Lane v. Pena*, 518 U.S. 187, 192 (1996). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit," without regard to any perceived unfairness, inefficiency, or inequity. *Dept. of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999).

The Tucker Act, under which CHO asserts jurisdiction, Compl. ¶ 20, waives sovereign immunity for certain non-tort claims against the United States founded upon the Constitution, a federal statute or regulation, or a contract. 28 U.S.C. § 1491(a)(1). The Tucker Act "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). "Thus, jurisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act itself." *Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) (citing *Testan*, 424 U.S. at 398). In meeting this burden, it is not enough for a plaintiff to point to a law requiring the payment of money in the abstract. Instead, the law must "fairly be interpreted as mandating compensation for damages sustained as a result of *a breach of . . . duties [it] impose[s]*." *United States v. Mitchell*, 463 U.S. 206, 219 (1983) (emphasis added).

Further, the law must entitle the plaintiff to "actual, *presently due* money damages from the United States." *Todd*, 386 F.3d at 1093-94 (quoting *King*, 395 U.S. at 3) (emphasis added);

*Johnson v. United States*, 105 Fed. Cl. 85, 94 (2012) ("Under the Tucker Act, the court's jurisdiction extends only to cases concerning actual, presently due money damages from the United States.") (internal quotation omitted); *see also Overall Roofing & Const. Inc. v. United States*, 929 F.2d 687, 689 (Fed. Cir. 1991) ("[T]he word 'claim' carries with it the historical limitation that it must assert a right to presently due money."), *superseded by statute on other grounds*, Pub. L. No. 102-572, Title IX, §§ 902(a), 907(b)(1), 106 Stat. 4506, 4516, 4519 (1992). Thus, where a plaintiff has received all the money it is currently due, the Court must dismiss the complaint for lack of jurisdiction. *Annuity Transfers, Ltd.*, 86 Fed. Cl. at 179.

**B. Additional Risk Corridors Payments Are Not Presently Due**

CHO's claim of Tucker Act jurisdiction rests on its mistaken assertion that HHS "has refused to pay Plaintiff the full amount Plaintiff is owed for 2014 and 2015 as required by Section 1342 and Section 153.510." Compl. ¶ 21; *see also* Compl. ¶¶ 85-86. HHS has not so refused. To the contrary (and as CHO acknowledges elsewhere in its Complaint), HHS has repeatedly stated that it will continue to make payments towards the calculated amount for each issuer, consistent with its three-year payment framework. *See, e.g.*, Compl. ¶¶ 47, 77. Because HHS is continuing to make payments in accordance with its administrative scheme, CHO cannot establish breach of a presently due obligation (and thus Tucker Act jurisdiction) unless HHS's three year payment framework is a violation of the statute. It is not.

**1. Congress Did Not Require Annual Payments**

"Section 1342 . . . does not obligate HHS to make annual payments." *Land of Lincoln Mut. Health Ins. Co. v. United States* ("*Land of Lincoln*"), 129 Fed. Cl. 81, 107 (2016) (Lettow, J.). Rather, section 1342 requires HHS to *calculate* risk corridors payments and charges based

on claims and other costs "for" a "benefit year," but it does not require HHS to *pay* those calculated amounts on an annual basis. Indeed, it does not set any deadline for risk corridors payments.

Instead, it delegates to HHS the responsibility to "establish and administer" the risk corridors program, 42 U.S.C. § 18062(a), thereby conferring "broad discretion" to HHS "to tailor [the] . . . program to fit both its needs and its budget." *Contreras v. United States*, 64 Fed. Cl. 583, 599 (2005), *aff'd*, 168 F. App'x 938 (Fed. Cir. 2006). This delegation necessarily contemplates substantial flexibility to administer the program—including the timing of payments—to accommodate programmatic constraints. *See, e.g., Y.S.K. Const. Co. v. United States*, 30 Fed. Cl. 449, 458 (1994) (delegation of "broad authority to administer the statutory program" necessarily entails "the authority to make any decisions necessary to fill any gaps or ambiguities in that statute"); *W.E. Partners II, LLC v. United States*, 119 Fed. Cl. 684, 692 (2015) (deferring to agency framework for payments under statutory program because the "discretion afforded to the Treasury Department suggest Congress's intent to defer to the agency with the administration of this law"), *aff'd*, 636 Fed. Appx. 796 (Fed. Cir. 2016); *Meyers v. United States*, 96 Fed. Cl. 34, 54-55 (2010) (deferring to agency where statute authorized it to "establish" regulatory program and did "not [expressly] proscribe" the programmatic framework established).

Indeed, the very design of the risk corridors program and its inter-relationship with other 3Rs programs necessarily requires flexibility in the timing of payments. For example, the ACA gives states responsibility for operating the reinsurance and risk adjustment programs unless they fail to do so, 42 U.S.C. §§ 18061(a), 18063(a), and requires that payments and charges in the

federally-administered risk corridors program take into account "risk adjustment and reinsurance payments received" through these programs. 42 U.S.C. § 18062(c)(1)(B). Thus, if the statute had set a deadline for risk corridors payments (it did not), that deadline could have come no earlier than many months after the close of a plan year, so that the federal government could wait for state-operated reinsurance and risk adjustment programs to run their course and then include the amounts calculated under those programs in calculating risk corridor charges and payments. *Id.* Furthermore, the ACA permits a state to "allocate[] and use[]" reinsurance collections "in any of the three calendar years for which amounts are collected based on the reinsurance needs of a particular period or to reflect experience in a prior period." *Id.* § 18061(b)(4)(A). If a state choosing to operate its own reinsurance program were to exercise that option, the Secretary would not be able to definitively determine a plan's risk corridors amount for any given year until after the conclusion of the three-year reinsurance program.

In light of these features, the absence of any statutory payment deadlines, and the express delegation to HHS of authority to "establish and administer" the program, CHO's contention that Congress has required HHS to make full payments annually is untenable.[8]

[8] On January 10, 2017, Judge Sweeney issued an opinion and order in another risk corridors case denying the United States' motion to dismiss on jurisdictional and ripeness grounds. *See generally Health Republic Ins. Co. v. United States*, No. 16-259C, 2017 WL 83818, at *10-18 (Fed. Cl. Jan. 10, 2017). In so denying, Judge Sweeney determined that section 1342 and HHS's administration of the statute contemplate annual payments. *Id.* at *13-18. However, Judge Sweeney did not conclude that HHS is required to make *full* payments on an annual basis, nor did she address the permissibility of the three-year budget neutrality framework. Rather, she reserved any finding on those points. *Id.* at *18. The United States respectfully disagrees with Judge Sweeney's conclusions regarding jurisdiction and ripeness.

### 2. Because HHS's Three-Year Framework Is Reasonable, Additional Payments Are Not Presently Due

In the absence of a contrary statutory provision, "agencies, not the courts, . . . have primary responsibility for the programs that Congress has charged them to administer." *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992), *superseded by statute on other grounds*, Pub. L. No. 104-134, § 803, 110 Stat. 1321 (Apr. 26, 1996). Courts must defer to an agency's interpretation of ambiguous statutory provisions, so long as that interpretation is reasonable. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). The Federal Circuit has stated that "the *Chevron* standard of deference applies" where, as here, "Congress either leaves a gap in the construction of the statute that the administrative agency is explicitly authorized to fill, or implicitly delegates legislative authority, as evidenced by 'the agency's generally conferred authority and other statutory circumstances.'" *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1361 (Fed. Cir. 2005) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001)).

HHS exercised the discretion conferred by Congress by establishing a three-year payment framework to govern circumstances where collections from issuers are insufficient to fund calculated payments. *See Land of Lincoln*, 129 Fed. Cl. at 104-05. Under this framework, if risk corridors claims exceed collections for a given benefit year, as they did for years 2014 and 2015, payments are temporarily reduced so as not to exceed HHS's budget authority for that year. However, further payments for that benefit year are made in subsequent payment cycles (after charges for a later benefit year have been collected), with final payment not due until the final payment cycle in 2017. *See* April 11 Guidance; November 19 Guidance.

HHS's three-year payment framework reasonably reflects (1) section 1342's

establishment of a program with only two types of payments: "payments in" and "payments out"; (2) Congress's decision not to appropriate or authorize any other source of funding for risk corridors payments when it enacted the ACA; (3) Congress's choice to omit from section 1342 the appropriation language used in the Medicare Part D statute; and (4) the Congressional Budget Office's scoring of the ACA. *See Land of Lincoln*, 129 Fed. Cl. at 104-07. The three-year framework thus permits HHS to pay out the maximum amount possible on claims for each program year while also conforming to the express statutory limitation in the subsequently enacted Spending Laws, which at all relevant times have precluded the use of appropriated funds other than risk corridors collections to make risk corridors payments. *Cf. Cobell v. Norton*, 428 F.3d 1070, 1075 (D.C. Cir. 2005) (noting that appropriations limits "unequivocally control what may be spent on [covered] activities during the period of their applicability," and concluding agency reasonably interpreted underlying 1994 statute by considering Congress's post-1994 appropriations limitations). And Congress expressly acknowledged the three-year span of the payment framework in the Explanatory Statement to the 2015 Spending Law. 160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014) (characterizing HHS's payment framework as "meaning that the federal government will never pay out more than it collects from issuers *over the three year period risk corridors are in effect*.") (emphasis added). HHS's three-year payment framework is entitled to deference as a permissible construction of section 1342 that fills a gap in the statute left by Congress and reflects the agency's considered deliberation, including in notice and comment rulemaking. *Land of Lincoln*, 129 Fed. Cl. at 105-07.

CHO's arguments otherwise are unpersuasive. First, CHO asserts that the statute is "clear and unambiguous" and that "Congress spoke directly" to the matter of timing. Pl.'s

Motion at 39; *see also id.* at 21, 28. But, a simple review of the statute demonstrates that this is not the case. As this Court has previously stated:

> Subsection 1342(b) governs the amounts that HHS must pay to and receive from qualified health plans, but it does not establish *when* these payments are to be made. Similarly, Subsection 1342(a) states that the Secretary "shall establish and administer" the program "for calendar years 2014, 2015, and 2016," *but it does not specify the timing of the various payments over those three years.*

*Land of Lincoln*, 129 Fed. Cl. at 104 (emphasis added). Thus, the fact that payments and charges are *calculated* "for" a benefit year does not mean that full payments also are *due* each year. As recognized in *Land of Lincoln*, although section 1342 contemplates that QHPs report costs on an annual basis, "that arrangement reflects the year-by-year transitory aspect of the temporary risk corridors program." *Id.* CHO points to no valid reason why annual *calculation* necessarily requires annual *payment* of those amounts in full, particularly given Congress's express funding limitations.[9]

Second, CHO contends that by providing in section 1342 that the ACA risk corridors program would be "based on" the program under Medicare Part D, Congress eliminated any discretion that might otherwise have existed and required HHS to adopt annual payments in full. *See* Pl.'s Motion at 22, 24-25, 30, 39. But Medicare Part D provides only that "[p]ayments under

---

[9] CHO also contends that Congress's use of the plural "risk corridor**s**" in section 1342 somehow means that payments must be made annually. Pl.'s Motion at 29. But a "risk corridor" merely refers to a designated percentage range represented by an issuer's ratio of allowable costs to the target amount. HHS is required to assign one of several risk corridors (*i.e.*, 92-97%, 103-108%) to every participating plan in each year. *See* 42 U.S.C. § 18062(b) (setting forth applicable corridors under the ACA); *see also* 42 U.S.C. § 1395w-115(e)(3) ("For each plan year the Secretary shall establish *a* risk corridor *for each* . . . plan.") (emphasis added). Thus, CHO's contention that "Congress intended to create three distinct risk corridors, one for each year of the [program]" is wrong. *See* Pl.'s Motion at 29. Congress's use of the plural denotes the fact that each issuer is assigned one of several possible risk corridors in each year. It says nothing about when payments must be made.

this section shall be based on such a method *as the Secretary determines*." 42 U.S.C. § 1395w-115(d) (emphasis added). Thus, HHS is no more statutorily required to remit annual payments under Medicare Part D than it is under the ACA. Moreover, while HHS has exercised its discretion under Medicare Part D to pay risk corridors payments on an annual basis, *see* 42 C.F.R. § 423.336(c), the agency is not required to adopt an identical approach under section 1342 simply because Congress required the program to be "based on" Part D. *See Land of Lincoln*, 129 Fed. Cl. at 105-06 (noting similarities and differences between section 1342 and Part D); *see also Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency*, 373 F.3d 1251, 1269 (D.C. Cir. 2004) ("[t]here is no question that the phrase 'based on' is ambiguous") (citation omitted).

Indeed, HHS could not have structured the ACA risk corridors payments identically to those made under Medicare Part D because Congress did not enact identical language for making payments. Whereas Congress expressly authorized funding for Part D payments, Congress did not do so as part of section 1342. *Compare* 42 U.S.C. §§ 1395w-115(a) (conferring budget authority "in advance of appropriations Acts") and 1395w-116 (authorizing "appropriations to cover Government contributions") (capitalization omitted), *with* 42 U.S.C. § 18062 (omitting any mention of government contributions). Thus, HHS's three-year payment framework reasonably filled a gap left by Congress regarding the method and timing of payments in the event of a shortfall in "payments in" for one or more program years. *See Land of Lincoln*, 129 Fed. Cl. at 106.[10]

[10] CHO misreads *Gonzales v. Oregon*, 546 U.S. 243 (2006). *See* Pl.'s Motion at 38. The issue there was not that the United States Attorney General did not have the expertise or experience to interpret the Controlled Substances Act, but that the Agency's regulation did "little more than restate the terms of the statute itself." *Id.* at 257. In contrast, HHS used its expertise here to

Third, CHO suggests that the three-year framework is at odds with the purpose of the risk corridors program because "[t]he RCP's entire purpose is to *stabilize* insurance premiums for each of the first three years of the exchanges' existence." Pl.'s Motion at 21, 22. Whether or not that is true, CHO offers no reason why the protection provided by the statute must be in the form of full annual payments, rather than partial payments spread out over the three years of the program. *See Land of Lincoln*, 129 Fed. Cl. at 106-07. In any event, Congress foreclosed full annual payments by enacting budget limitations that, at present and in light of the shortfall in collections, both prevent HHS from making full annual payments and contemplate that payments may be made in any payment cycle across the "three year period risk corridors are in effect." 160 Cong. Rec. H9838 (Dec. 11, 2014).

Fourth, relying on *King v. Burwell*, 135 S. Ct. 2480 (2015), CHO argues that deference is not warranted because whether the risk corridors program was intended to be administered in a budget neutral manner is a matter of such "economic and political significance" that it would be odd, if not downright unconstitutional, for Congress to delegate it to an agency. Pl.'s Motion at 38. In *King*, the Supreme Court held that deference was not due to the IRS's interpretation of the statute because, "[i]n extraordinary cases, . . . there may be reason to hesitate before concluding that Congress has intended such an implicit delegation." *Id.* at 2488-89. This is not such an "extraordinary case." Unlike in *King*, Congress's delegation of authority to HHS to "administer" section 1342 is explicit. 42 U.S.C. § 18062(a). Furthermore, while the 3Rs programs serve an important role in achieving the goals of the ACA in its early years, the question here—when payments are due under section 1342—is not "central to th[e] statutory scheme." *Id.* at 2489.

---

meaningfully interpret and administer the statute in a manner that is consistent with, but does not merely parrot, the statute.

And whereas the Supreme Court concluded that the IRS "has no expertise in crafting health insurance policy of this sort," *id.*, HHS has precisely this type of technical expertise in administering a risk corridors program (Medicare Part D) that the Supreme Court found lacking in *King*. Accordingly, *Chevron* deference applies. *See Land of Lincoln*, 129 Fed. Cl. at 106.

Fifth, CHO argues that HHS's budget-neutrality framework is only entitled to limited deference because it was "never raised as part of the notice-and-comment rulemaking process." Pl.'s Motion at 39. CHO is incorrect: HHS's three-year, budget-neutral framework was subject to the notice and comment process. *See Patient Protection and Affordable Care Act; Exchange and Insurance Market Standards for 2015 and Beyond*, Final Rule, 79 Fed. Reg. 30240, 30259-61 (May 27, 2014) (addressing "expressed concern with HHS's intention to implement the risk corridors program in a budget neutral manner"); *see also Land of Lincoln*, 129 Fed. Cl. at 106 ("HHS's interpretation reflects the agency's deliberations and efforts through the rulemaking process.").[11]

Sixth, CHO asserts that "the Government's position that the RCP was intended to be administered on a budget-neutral basis . . . is inconsistent with the agency's original position that the RCP should not, and would not, be administered in a budget-neutral manner, and the agency has not once to date offered any explanation for why it reversed its original position." Pl.'s Motion at 39; *see also id.* at 30-31 (asserting original agency position was to provide timely annual payments). HHS had no "original position." The statements CHO presumably relies upon merely "reflect[] the agency's deliberations and efforts through the rulemaking process.

[11] In any event, HHS's interpretation easily passes muster under the *Skidmore* and *Mead* standard because it is the only interpretation consistent with the legislative scheme, the legislative history, and the Appropriations Clause of the United States Constitution. *Land of Lincoln*, 129 Fed. Cl. at 103-08.

The fact that the agency may have taken inconsistent positions prior to 2014 does not alter the analysis." *Land of Lincoln*, 129 Fed. Cl. at 106 (citing *Chevron*, 467 U.S. at 863-64); *see also Office of Personnel Management v. Richmond*, 496 U.S. 414, 432 (1990) (an agency's public statements cannot, in and of themselves, create a payment obligation). And, even if this Court were to credit any pre-March 2014 HHS statements, those statements are not dispositive here because Congress acted in response to them by ratifying HHS's three-year budget-neutral framework. Moreover, HHS has consistently stated since March 2014 that the risk corridors program would be administered in a budget-neutral manner and that HHS would make full payments to issuers to the extent of appropriations. Thus, to the extent that CHO claims that it would not have participated on the Exchanges without guaranty of full annual payments, that claim is belied by CHO's continued participation on the Maine and New Hampshire Exchanges *after* it knew that HHS would implement the risk corridors program in a budget-neutral manner.[12]

Finally, CHO suggests that the lack of an annual payment deadline for HHS is arbitrary or unfair because issuers are required to remit their payments annually. Pl.'s Motion at 28-32.

---

[12] CHO also suggests that because HHS has recorded risk corridors payments as fiscal year 2015 obligations for budgeting purposes, the United States admits that it presently owes full payment as calculated under section 1342. Pl.'s Motion at 12, 15-17; Compl. ¶ 51. This is incorrect. To comply with federal appropriation law, agencies are required to charge and record obligations to the fiscal year in which they are incurred, including indefinite obligations. *See generally* 31 U.S.C. § 1501; *see also, e.g., To the Adm'r, Veterans Admin.*, 39 Comp. Gen. 422, 424 (Dec. 4, 1959) ("The general rule is that expenditures are properly chargeable to the appropriation for the fiscal year in which the liability therefor was incurred."). As a result, agencies routinely record obligations that are not yet due, including certain obligations that may never come due. Moreover, "[i]f a given transaction is not sufficient to constitute a valid obligation, recording it will not make it one." GAO, Principles of Federal Appropriations Law (GAO Redbook) (Vol. II) at 7-8 (3d ed. 2004) (citations omitted). Appendix at A103, A104.

But in the absence of an independent and ready source of unlimited funding, symmetrical deadlines for HHS and issuers would only set HHS up to miss its deadlines. Indeed, because risk corridors payments are funded through collections, the agency cannot make any payments at all until issuers make their payments. Furthermore, even with the 30-day deadline for issuers, HHS is not guaranteed to collect the full amount of assessed charges (some issuers may not remit their payments on time or ever), and some of the calculated charge amounts may be reversed on appeal. Thus, while HHS does remit payments on an annual basis to the extent possible, HHS defers payment to later years where the amount of risk corridors collections does not permit it to make full payments in that year. *Id.* That deferral is a rational response to a shortfall in collections and Congress's express funding limitations. CHO does not (and cannot) dispute that HHS makes risk corridors payments as promptly as possible within these programmatic and budgetary constraints.[13]

In sum, HHS's three-year payment framework reasonably accounts for the fact that collections are the only authorized source of funding for risk corridors payments, while also ensuring that HHS pays out as much as it can each year within the statutory and programmatic constraints. In contrast, CHO's interpretation that section 1342 requires full, annual payments,

---

[13] CHO characterizes this framework—in which it has knowingly participated since April 2014—as a "heads-the-Government wins, tails the insurer-loses" obligation. Pl.'s Motion at 5. This is inaccurate: there is no scenario under which the government "wins" and issuers "lose." Rather, issuers with profits exceeding a threshold amount are required to make payments to HHS, and HHS uses those payments to compensate issuers with losses beyond a threshold amount. *See* Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2016, Final Rule, 80 Fed. Reg. 10750, 10779 (Feb. 27, 2015) (explaining that "if, when the risk corridors program concludes, cumulative risk corridors collections exceed [cumulative payments], we would increase the administrative cost ceiling and the profit floor in the risk corridors formula by a percentage calculated to pay out all collections to QHP issuers.").

Pl.'s Motion at 23-32, is legally flawed and would disregard Congress's intent in passing the Spending Laws. Because section 1342 does not require—and, in light of the shortfall in collections, the Spending Laws do not permit—full payment on an annual basis, the Court must defer to HHS's three-year framework. *See Land of Lincoln*, 129 Fed. Cl. at 106-08. Under that framework, additional payments are not presently due, and the Court lacks jurisdiction to consider CHO's claims.[14]

## II. CHO's Claims Are Not Ripe

CHO's claims also should be dismissed because they are not ripe. "Ripeness is a justiciability doctrine that prevents the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1348 (Fed. Cir. 2015) (citations and internal punctuation omitted); *see also Barlow & Haun, Inc. v. United States*, 118 Fed. Cl. 597, 614-15 (2014) ("[T]he court may find that it possesses jurisdiction over the subject matter of a claim but that the dispute is

[14] In *Land of Lincoln*, Judge Lettow deferred to HHS's three-year payment framework as a reasonable construction of section 1342, but he concluded that he had jurisdiction nonetheless. Judge Lettow reasoned that a "presently due" claim is a jurisdictional requirement only when a plaintiff's claim is founded on a contract, rather than on a money-mandating statute or regulation. 129 Fed. Cl. at 97. The United States respectfully disagrees that such a distinction is warranted under either the text of the Tucker Act or Supreme Court precedent. Two of the cases relied upon by *Todd*, both cited in *Land of Lincoln*, 129 Fed. Cl. at 97, upheld the requirement that a plaintiff's *statutory* (not contract) claim be "presently due" for this Court to have jurisdiction. *See Testan*, 424 U.S. at 394 (bringing claim for reclassification under the Classification Act, 5 U.S.C. § 5101, *et seq.*); *King*, 395 U.S. at 2 (making claim that the Army's failure to retire the plaintiff for disability deprived him of an income tax exemption permitted by 26 U.S.C. § 104(a)(4)). Moreover, CHO concedes that the Tucker Act requires a "presently due" right to payment. Pl.'s Mot. at 19-20. But even if the "presently due" requirement is not jurisdictional, the absence of any present entitlement to additional payments requires dismissal of CHO's claims under RCFC 12(b)(6). *See Land of Lincoln*, 129 Fed. Cl. at 106-08 (granting judgment for the United States because issuer had no present entitlement to additional payments).

nevertheless nonjusticiable.”).[15] Because “[t]he role of the federal courts is to provide redress for injuries that are ‘concrete in both a qualitative and temporal sense,’ . . . [a]dherence to ripeness standards prevents courts from making determinations on the merits of a case before all the essential facts are in.” *Shinnecock Indian Nation*, 782 F.3d at 1351-52 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). “[A] claim is not ripe for adjudication if it rests upon ‘contingent future events that may not occur as anticipated, or indeed may not occur at all’ . . . [or] ‘if further factual development is required.’” *Id.* at 1349 (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985); *Rothe Dev. Corp. v. Dep’t of Def.*, 413 F.3d 1327, 1335 (Fed. Cir. 2005)).

CHO asserts that the “controversy is ripe because CMS has refused to pay [CHO] the full amount . . . owed for 2014 and 2015 as required by Section 1342 and Section 153.510.” Compl. ¶ 21. However, CHO’s claims are not ripe because HHS has not yet finally determined the total amount of payments that CHO (or any other issuer) will receive under the risk corridors program. While the final risk corridors program benefit year ended on December 31, 2016, the final payment and collections cycle will not commence until later in 2017 when issuers submit their claims data to HHS on July 31, upon which HHS will calculate 2016 benefit year charges and payments. Whether sufficient funds will be available to make full risk corridors payments for any particular benefit year, and for all three years combined, is therefore presently unknown. HHS may collect sufficient funds this year to pay risk corridors claims in full. Alternatively, Congress may appropriate additional funds for the program to pay all risk corridors amounts as

[15] Although the constitutional basis for the justiciability doctrine derives from the “cases or controversies” requirement in Article III of the Constitution, this Court applies the doctrine on prudential grounds. *See, e.g.*, *CW Gov’t Travel, Inc. v. United States*, 46 Fed. Cl. 554, 557-58 (2000) (collecting cases).

calculated under section 1342(b). Furthermore, deferring a decision on plaintiff's claims will not affect whether CHO will offer QHPs in 2017; CHO has already made that decision. Pl.'s Motion at 9. Conversely, exercising judicial restraint until the conclusion of the program permits resolution through administrative and political processes to the extent possible and conserves judicial resources should the dispute fail to move from conjectural to concrete.

This Court does not address hypothetical situations that may be fully addressed by agency action, legislative action, or the passage of time. *See, e.g.*, *Shinnecock Indian Nation*, 782 F.3d at 1351-52 (affirming dismissal for lack of ripeness where "multiple possible . . . outcomes and factual developments could impact the Court of Federal Claims' adjudication" of plaintiff's claims). In short, it is too soon to determine whether CHO will receive less than the full amount of its risk corridors claims, much less the extent of any such underpayment. This case is not ripe and should be dismissed.

## III. If the Court Reaches the Merits, the Case Should be Dismissed, and CHO's Motion for Summary Judgment Denied, Because CHO Fails to State a Claim upon Which Relief Can Be Granted

For the reasons set forth above, the Complaint should be dismissed for lack of jurisdiction and lack of a justiciable claim. If, however, the Court determines that it has jurisdiction and that the claims are justiciable, the case should be dismissed under Rule 12(b)(6). RCFC 12(b)(6) requires a court to dismiss a claim that fails to state a claim on which relief can be granted. To avoid dismissal, a plaintiff must "provide the grounds of [its] entitle[ment] to relief" in more than mere "labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation and quotation marks omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A "formulaic recitation of the elements of a cause of action" is insufficient. *Twombly*,

550 U.S. at 555. Rather, a complaint must "plead factual allegations that support a facially 'plausible' claim to relief," *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009). The Court must dismiss a claim "when the facts asserted by the claimant do not entitle [it] to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).

### A. The ACA Does Not Mandate Risk Corridors Payments In Excess of Amounts Collected

CHO is not entitled to additional payments at this time because Congress has not mandated that HHS make risk corridor payments in excess of collections. *See Land of Lincoln*, 129 Fed. Cl. at 103-08. Rather, Congress planned the program to be self-funding: insurers that have lower-than-expected costs for a given year are required to make contributions to the program, and those contributions are used to fund payments to insurers that have higher-than-expected costs. Subsection (a) of section 1342 requires HHS to establish and administer a temporary "payment adjustment system" based on the ratio of a plan's allowable costs to the plan's aggregate premiums. HHS fulfills that role by collecting charges from plans whose allowable costs are less than the threshold and distributing those funds to plans whose allowable costs exceed the threshold. But nothing in section 1342 requires HHS to make up a shortfall in collections. To the contrary, section 1342 creates a program with only "payments in" and "payments out." 42 U.S.C. § 18062(b) (capitalization altered). Insurers are assessed charges or receive payments "under the program," 42 U.S.C. § 18062(b)(1) and (2), and HHS distributes the monies accordingly. The statute contains no reference to any other source of funds.[16]

[16] Responding to a request for an opinion regarding the availability of appropriations to make risk corridors payments, the GAO concluded that, as a matter of appropriations law, the CMS Program Management appropriation in effect for fiscal year 2014 would have been available to make risk corridors payments and also would have appropriated risk corridors collections to

CHO relies heavily on the language of subsection (b), which, in setting forth the "payment methodology," states that "the Secretary shall pay" amounts calculated in specified fashion. 42 U.S.C. § 18062(b)(1); *see* Compl. ¶¶ 34, 40, 72. But subsection (b) merely describes the "methodology" to be applied by HHS as it adjusts funds between plans "under the program"; it nowhere states that HHS or the United States must provide additional funds to insurers when the funds available "under the program" fall short of the statutory amounts. Under CHO's interpretation, HHS would be the uncapped insurer of the insurance industry itself, under criteria—the ratio of a plan's allowable costs to its aggregate premiums—which are wholly dependent upon issuers' business judgment. Congress did not intend that result.

When Congress enacted section 1342, it did not appropriate money for risk corridors payments. *See Land of Lincoln*, 129 Fed. Cl. at 91-92 (citing *The Honorable Jeff Sessions the Honorable Fred Upton*, B-325630, 2014 WL 4825237, at *2 (Sept. 30, 2014) ("*GAO Op.*") ("Section 1342, by its terms, did not enact an appropriation to make the payments specified in section 1342(b)(1)")). In contrast, Congress did appropriate funds for many other programs. *See, e.g.*, 42 U.S.C. §§ 18001(g)(1), 18031(a)(1), 18042(g), 18043(c), 18121(b). Congress also omitted from section 1342 the language that it frequently uses when it intends payments to be funded from the Treasury through the annual appropriations process. *See Land of Lincoln*, 129 Fed. Cl. at 104-05. In such cases, Congress typically enacts an "authorization of appropriations" provision, as it did in dozens of other provisions in the ACA. *See, e.g.*, Pub. L. No. 111-148, § 2705(f), 124 Stat. 119, 325 (2010) ("There are authorized to be appropriated such sums as are

---

HHS to make risk corridors payments had any obligation to make payments existed in that fiscal year. *See GAO Op.*, 2014 WL 4825237, at *5. HHS had identified only collections as a source of funds for payments. *Id.* The GAO did not address whether HHS was required under section 1342 to make payments in excess of collections.

necessary to carry out this section.”).[17] The absence of either an appropriation or an authorization of appropriations for section 1342 indicates that Congress understood that funding for risk corridors payments would come from risk corridors collections. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2583 (2012) (“Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally.”).

This understanding is further confirmed by the contrast between section 1342 and the preexisting risk corridors program under Medicare Part D. The Medicare Part D statute expressly provides: “This section constitutes budget authority in advance of appropriations Acts and represents the obligation of the Secretary to provide for the payment of amounts provided under this section.” 42 U.S.C. § 1395w-115(a)(2). By contrast, there is no such language in section 1342. Accordingly, although Congress specified that the ACA's temporary risk corridors program was generally to be “based on” the risk corridors program under Medicare Part D, *see* 42 U.S.C. § 18062(a), Congress omitted from the ACA the explicit statutory language that permits the Secretary to make payments under the Medicare Part D risk corridors program in excess of amounts collected under that program.

Thus, when the CBO performed a cost estimate contemporaneously with the Affordable Care Act's passage, it omitted the risk corridors program from its scoring, again manifesting an understanding that the program would be budget neutral. *See* Letter from Douglas Elmendorf,

---

[17] *See also, e.g.*, *id.*, §§ 1002, 2706(e), 3013(c), 3504(b), 3505(a)(5), 3505(b), 3506, 3509(a)(1), 3509(b), 3509(e), 3509(f), 3509(g), 3511, 4003(a), 4003(b), 4004(j), 4101(b), 4102(a), 4102(c), 4102(d)(1)(C), 4102(d)(4), 4201(f), 4202(a)(5), 4204(b), 4206, 4302(a), 4304, 4305(a), 4305(c), 5101(h), 5102(e), 5103(a)(3), 5203, 5204, 5206(b), 5207, 5208(b), 5210, 5301, 5302, 5303, 5304, 5305(a), 5306(a), 5307(a), 5309(b).

Director, Congressional Budget Office, to Nancy Pelosi, Speaker, House of Representatives, Tbl. 2 (Mar. 20, 2010), Appendix at A51, A68. The CBO's cost estimate was critical to ACA's passage, and was referenced in the text of ACA itself. *See* ACA § 1563(a), 124 Stat. 270-271; *see also* David M. Herszenhorn, *Fine-Tuning Led to Health Bill's $940 Billion Price Tag*, N.Y. Times, Mar. 18, 2010, Appendix at A100-A102. And that critical estimate of ACA's fiscal consequences was predicated on the understanding that the risk corridors program would not impose liability on the government for payments in excess of amounts collected under the risk corridors program.[18]

In sum, CHO's argument that the United States is required to make full payments annually without regard to the amount of collections is inconsistent with section 1342's structure, the distinct absence in the ACA of a separate funding mechanism, and Congress' budgetary considerations at the time of the ACA's passage. These indicia of congressional intent regarding the budgetary impact of section 1342 cannot be overcome with unsupported appeals to the general purpose of the program or the ACA because "no legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (emphasis

[18] Citing *Sharp v. United States*, 580 F.3d 1234 (Fed. Cir. 2009), a case involving post-enactment CBO scoring, CHO suggests that consideration of the CBO's pre-enactment scoring is improper because it "does not bear on congressional intent." Pl.'s Motion at 25-26 n.20. But unlike in *Sharp*, the CBO's cost estimate of the ACA was performed contemporaneously with the legislative process, was critical to the Act's passage, and is explicitly referenced in the text of the Act. ACA § 1563(a)(1). Accordingly, the Court should consider that estimate when determining Congress's intent in section 1342. *See Land of Lincoln*, 129 Fed. Cl. at 104.

in original). *See also Land of Lincoln*, 129 Fed. Cl. at 107. Because section 1342 does not give insurers a right to risk corridors payments from the Secretary in excess of collections, CHO's Tucker Act claims fail as a matter of law.[19]

### B. Congress's Post-ACA Enactments Confirm That Insurers Do Not Have an Entitlement to Risk Corridors Payments In Excess of Collections

The appropriations riders that Congress enacted after the ACA's passage confirm that the liability of the United States is limited to amounts collected under the risk corridors program. HHS announced its three-year framework for implementing budget neutrality in final rules and guidance issued in the spring of 2014. 79 Fed. Reg. at 13787; 79 Red. Reg. at 30,260; April 11 Guidance. In September 2014, the GAO released its opinion that, under the language of CMS's then-effective Program Management appropriation, monies transferred to the Program Management account from CMS trust funds would be available for risk corridors payments. *See GAO Op.*, 2014 WL 4825237, at *3. And, shortly thereafter, on December 9, 2014, Congress passed the 2015 Spending Law with a rider prohibiting the use of monies transferred to the Program Management account to make risk corridors payments, leaving collections as the only source of funding. Pub. L. No. 113-235, div. G, title II, § 227. The following year, Congress enacted an identical rider in the 2016 Spending Law. Pub. L. No. 114-113, div. H, title II, § 225. Congress's intent in each of the Spending Laws was clear: to ensure "that the risk corridor program will be budget neutral . . . over the three year period risk corridors are in effect," 160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014), and to "requir[e] the administration to operate the

---

[19] HHS's various statements, described on pp. 10-11, addressed the agency's efforts to make risk corridors payments, subject to the availability of appropriations. The statements do not address the validity of claims against the United States under the Tucker Act, a matter that Congress did not delegate to the agency.

Risk Corridor program in a budget neutral manner," Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriation Bill, 2016, S. Rep. No. 114-74 at 12, (2015). The 2015 and 2016 appropriations riders thus confirm what is implicit in the structure of the Act itself—that Congress intends HHS to administer the risk corridors program as a self-funding program of redistribution among insurers.[20]

Even if this were not the intent behind section 1342 as originally enacted, it is indisputably the intent of the Congress that enacted the Spending Laws. "[I]t is a well-established doctrine that Congress can authorize a deviation from pre-existing law by a provision in an appropriations act." *Bickford v. United States*, 228 Ct. Cl. 321, 329 (1981); *see, e.g.*, *United States v. Dickerson*, 310 U.S. 554, 555-56 (1940) (Congress can "suspend or repeal [an] authorization contained in [its own acts] . . . by an amendment to an appropriation bill, or otherwise"); *Republic Airlines, Inc. v. U.S. Dep't of Transp.*, 849 F.2d 1315, 1320 (10th Cir. 1988) ("Congress can amend substantive legislation through a provision in an appropriations

---

[20] CHO suggests that the Court should not give effect to the clear intent of the riders merely because Congress introduced bills to impose budget neutrality on the risk corridors program that were not ultimately enacted. Pl.'s Mot. at 10-11, 34-36. Courts have repeatedly rejected such arguments. "Congressional inaction lacks 'persuasive significance' because 'several equally tenable inferences' may be drawn from such inaction, '*including the inference that the existing legislation already incorporated the offered change*.'" *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (emphasis added) (citing *United States v. Wise*, 370 U.S. 405, 411 (1962)); *see also Balelo v. Baldrige*, 724 F.2d 753, 762-63 (9th Cir.) ("the mere failure of [a] bill to be enacted does not demonstrate congressional disapproval"), *cert. denied*, 467 U.S. 1252 (1984); *Kennedy for President Comm. v. F.C.C.*, 636 F.2d 432, 453-54 (D.C. Cir. 1980) (MacKinnon, J., conc.) ("the mere failure of Congress to pass a bill that has been introduced does not constitute 'legislative history' of Congressional intent to reject the provisions in said bill that are not incorporated in final legislation accomplished by another bill."). This principle holds special force where, as here, the bills at issue "were sent to an appropriate committee but were never reported out." *Order of Ry. Conductors of Am. v. Swan*, 329 U.S. 520, 529 (1947); *United States v. Wrigley*, 520 F.2d 362, 367 n.9 (8th Cir. 1975). In any event, CHO fails to offer any plausible congressional intent behind the Spending Laws other than to ensure that the program is budget neutral.

act."); *Envirocare of Utah Inc. v. United States*, 44 Fed. Cl. 474, 482 (1999) (appropriations laws are "'just as effective a way to legislate as are ordinary bills relating to a particular subject'") (citation omitted); GAO, GAO–04–261SP, *Principles of Federal Appropriations Law (Vol. I)* 2-62-63 (4th ed. Mar. 10, 2016) ("Congress may enact a subsequent appropriation that makes a smaller payment than was contemplated in the permanent legislation . . . as long as the intent to reduce the amount of the payment is clear.").

CHO is thus incorrect to suggest that Congress could not use the appropriations process to modify section 1342. Pl.'s Motion at 32-38. In fact, a long line of Supreme Court and appellate cases have held that provisions enacted in annual appropriations laws, such as the spending limits at issue here, can substantively amend money-mandating provisions in previously enacted laws, thereby eliminating or reducing a claimant's right to payment. In *Dickerson*, for example, the Supreme Court considered the effect of an annual appropriations law providing that "no part of any appropriation contained in this or any other Act for the fiscal year ending June 30, 1938, shall be available for the payment of [an] enlistment allowance . . . notwithstanding . . . [previously enacted legislation mandating that such allowance 'shall be paid']." *Dickerson*, 310 U.S. at 556-57. The Court held that the plaintiff was not entitled to collect such an allowance, notwithstanding the prior statute, because the statutory context and the legislative history showed that "Congress intended [the appropriations law] to suspend the enlistment allowance" for the fiscal year at issue. *Id.* at 561-62.

Similarly, in *United States v. Will*, 449 U.S. 200 (1980), on which CHO relies (Pl.'s Motion at 37), the Supreme Court held that appropriations language providing that "[n]o part of the funds appropriated for the fiscal year ending September 30, 1979 . . . may be used to pay"

salary increases mandated by earlier legislation "indicate[d] clearly that Congress intended to rescind these raises entirely, not simply to consign them to the fiscal limbo of an account due but not payable. The clear intent of Congress . . . *was to stop for that year the application of the* . . . *Act*." *Id.* at 224 (emphasis added); *see also United States v. Mitchell*, 109 U.S. 146, 148 (1883) (holding that "by the appropriation acts which cover the period for which the appellee claims compensation, congress expressed its purpose to suspend the operation of [a prior statute fixing salaries] and to reduce for that period the salaries of the appellee and other interpreters of the same class from $400 to $300 per annum"); *Matthews v. United States*, 123 U.S. 182, 186 (1887) (appropriations law capping salaries "in full compensation" for services "repealed, by necessary implication[,] . . . previous enactments" setting higher compensation).

In *Highland Falls–Fort Montgomery Cent. Sch. Dist. v. United States*, 48 F.3d 1166, 1171-72 (Fed. Cir. 1995), the Federal Circuit likewise gave effect to congressional intent in an earmarked appropriation that limited and modified previously enacted statutory directions for the payment of money. Other circuits have reached similar conclusions.[21]

[21] For example, in *Republic Airlines*, an annual appropriation law stated that "notwithstanding any other provision of law, none of the funds appropriated by this Act shall be expended under section 406 [of the Federal Aviation Act of 1958] for [certain] services provided after ninety-five days following the date of the enactment of this Act." 849 F.2d at 1317 (citing Pub. L. No. 97-102). The Tenth Circuit held that the appropriations restriction substantively amended the previously existing subsidy program under section 406 of the Act, thereby limiting the Civil Aeronautics Board's power to pay subsidies. *Id.* at 1319-22 (citing *Will*, 449 U.S. at 223; *American Fed'n of Gov't Employees, AFL–CIO v. Campbell*, 659 F.2d 157, 157 (D.C. Cir. 1980)). In so holding, the court rejected the airlines' argument that "Congress intended in section 406(b) to create an entitlement which was to survive appropriations actions," concluding that the "appropriations act directly addressed, and limited, the subsidy payable by the Board under section 406 and, perforce, altered any 'entitlement' to which the Airlines refer." *Id.* at 1319. *See also City of Arcata v. Slater*, 133 F.3d 926, 1997 WL 812258, at *2 (9th Cir. 1997) [unpublished table op.] (holding that the "plain language" of the appropriations law stating that "none of the funds in this Act may be obligated or expended to operate" flight service station

In many of these cases, Congress prohibited payment from the appropriations act as a whole (or, in *Dickerson*, from any appropriations act for the fiscal year at issue), or Congress capped payments at a lesser amount than specified. In contrast, because the risk corridors program includes collections from issuers, Congress did not intend through the 2015 and 2016 Spending Laws to eliminate risk corridors payments under section 1342 entirely or to reduce payments by a specific amount, but instead intended to limit payments to the extent of risk corridors collections. Moreover, because collections are themselves considered an appropriation as a matter of appropriations law, rather than prohibiting payments from the Spending Laws as a whole (as the riders at issue in many cases did), Congress included riders that limited risk corridors payments to amounts derived from collections in the CMS Program Management appropriation, the only source of funding the GAO had determined to be legally available for risk corridors payments. The riders thus demonstrate Congress's intent that the risk corridors program be budget neutral.

The cases discussed above demonstrate that Congress can suspend or modify the extent of the government's obligation in an appropriations statute, and that Congress can demonstrate its intent to do so through the text of the appropriations statute itself, the surrounding context in which the appropriation was made, or the statute's legislative history. Here, in enacting the 2015 and 2016 Spending Laws, Congress demonstrated its intent that the risk corridors program be

"defunds everything that [the prior act] obligates the FAA to do. Accordingly, the FAA's obligation to implement that section has been suspended") (citing *Burtch v. United States Dep't of the Treasury*, 120 F.3d 1087, 1090 (9th Cir. 1997)); *Am. Fed'n of Gov't Emp., AFL-CIO*, 659 F.2d at 161 ("the [appropriations act] in this case contains words that by clear implication, if not express statement, modified *pro tanto* the previous substantive law. Consequently, we conclude that Congress, by express reference to the earlier statute, effectively modified the prevailing rate statute to provide that wages for prevailing rate employees could not be increased by more than 5.5% for fiscal year 1979.").

budget neutral for those fiscal years. Thus, even if Congress's intent to limit the United States' liability to the extent of risk corridors collections were unclear at the time the ACA was enacted, by the time any payments could be made, Congress had "directly spoken" to the issue by restricting the use of HHS funds to support the risk corridors program. *Highland Falls*, 48 F.3d at 1170. Issuers' remedy "must lie with Congress." *Richmond*, 496 U.S. at 432 (1990).[22]

Disregarding these cases, CHO cites inapposite cases to argue that the Spending Laws could not alter the United States' alleged obligation to make full payments. Pl.'s Motion at 26, 33, 34, 37. But unlike the dicta in *Greenlee Cty. v. United States*, 487 F.3d 871, 877 (Fed. Cir. 2007) (Pl.'s Motion at 33), or the appropriations law at issue in *United States v. Langston*, 118 U.S. 389 (1886) (Pl.'s Motion at 33), this case does not concern a "mere" failure of Congress to appropriate funds or the "mere" appropriation of lesser amounts without further indicia of congressional intent to cap payments. Rather, for the only fiscal years in which risk corridors payments could be made, Congress enacted appropriations laws specifically referencing risk corridors payments, limiting the source of funds to pay them, and explaining (through an

[22] CHO is incorrect to suggest that this use of the appropriations process constitutes retroactive legislation or violates the Due Process Clause. Pl.'s Motion at 36 n.26. "A statute does not operate 'retrospectively' merely because it is applied [to] conduct antedating the statute's enactment, or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events *completed before its enactment*." *Landgraf v. USI Film Prod.*, 511 U.S. 244, 269-70 (1994) (emphasis added) (citation omitted). Here, the Spending Laws are not retroactive because no right to receive risk corridors payments could come into existence until the completion of the benefit year and the determination of aggregate profit or loss (as defined by the risk corridors formula) at the conclusion of that year. Because the 2015 Spending Law was enacted before the completion of the first benefit year, the Law did not attach new legal consequences to any "events completed before its enactment," and thus should not be considered retroactive. *Landgraf*, 511 U.S. at 270. In any event, courts must give effect to retroactive laws if "their language requires this result." *Id.* at 272. The Spending Laws—including their restrictions—govern the fiscal years during which risk corridors payments could be made. The restrictions on funding for risk corridors payments must, therefore, be given the temporal effect prescribed by Congress. *Landgraf*, 511 U.S. at 280.

Explanatory Statement and committee reports) that the purpose of the riders is to ensure budget neutrality. Because that congressional intent is plain and unmistakable, this case is also unlike *New York Airways, Inc. v. United States*, 369 F.2d 743 (Ct. Cl. 1966) (Pl.'s Motion at 26, 33, 37), where the court determined that a binding contractual obligation existed and, in any event, congressional intent to limit the obligation in the appropriations law at issue was unclear. 369 F.2d at 748-49. Indeed, *New York Airways* recognizes that where, as here, congressional intent in the legislative history is clear, a restriction on appropriations can modify or limit a statutory obligation, thus placing it "within the ambit of *Dickerson*." 369 F.2d at 750; *see also Highland Falls*, 48 F.3d at 1166.[23]

Because CHO presents no authority countering the long line of Supreme Court and appellate cases that have held that provisions enacted in annual appropriations laws, like those here, may eliminate or reduce a claimant's right to payment, CHO's case must be dismissed for failure to state a claim upon which relief may be granted.[24]

---

[23] The remainder of CHO's cases are similarly off-point. In *Gibney v. United States*, 114 Ct. Cl. 38 (1949) (Pl.'s Motion at 34, 40), the court merely applied the plain language of the subsequently enacted law, which incorporated the prior law by reference. *Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 133 (1974) (Pl.'s Motion at 36, 37), simply recites the "canon of construction . . . that repeals by implication are disfavored." But the appropriation riders do not repeal section 1342; the riders merely limit the United States' liability to make risk corridors payments to the amount of collections, to the extent section 1342 did not already do so as enacted. In any event, Congress's intent is clear that, under the riders, the risk corridors program would be budget neutral.

[24] Alternatively, if the Court concludes that section 1342 is ambiguous regarding the timing and source of payments, then the Court can dismiss the case under RCFC 12(b)(6) on the basis that HHS's three-year, budget neutral framework reflects a reasonable construction of the statute and is consistent with the subsequently enacted Spending Laws. *Land of Lincoln*, 129 Fed. Cl. at 106-08.

### C. Congress Could Limit the United States' Liability Through Appropriations Restrictions Because the Risk Corridors Program Does Not Impose Contractual Obligations on the United States

The Supreme Court has recognized a limitation on Congress's ability to curtail the government's contractual liability through the appropriations process. *Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181, 2189 (2012); *Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631, 646 (2005). The Court made clear, however, that this limitation is based on "longstanding principles of Government contracting law," *Ramah Navajo*, 132 S. Ct. at 2186, and the observation that "[a] statute that retroactively repudiates the Government's contractual obligation may violate the Constitution," *Cherokee Nation*, 543 U.S. at 646. Thus, this Court and the Court of Appeals have held that the rule of *Ramah Navajo* is confined to obligations based in contract and does not apply to other statutory programs, such as the risk corridors program at issue here. *See, e.g.*, *Prairie Cty. Mont. v. United States*, 113 Fed. Cl. 194, 200 (2013) (observing that "'there is great room in benefits programs to find the government's liability limited to the amount appropriated'") (quoting *Greenlee Cty. v. United States*, 487 F.3d 871, 879 (Fed. Cir. 2007)), *aff'd*, 782 F.3d 685, 690 (Fed. Cir. 2015) ("[T]his case does not involve the same question as that addressed by the Supreme Court in *Ramah* and *Cherokee Nation*. *Absent a contractual obligation*, the question here is whether the statute reflects congressional intent to limit the government's liability.") (emphasis added), *cert. denied*, 136 S. Ct. 319 (Oct. 13, 2015).

The limited contract-based doctrine of *Ramah Navajo* does not apply here because CHO does not bring a contract claim, and section 1342 provides for the creation of a benefits program, not a contract. Thus, Congress was free to "readjust[] rights and burdens" and even "upset[ ] otherwise settled expectations," *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16 (1976), by

limiting the "government's liability . . . to the amount appropriated," *Prairie Cty. Mont.*, 113 Fed. Cl. at 200. *See also Richardson v. Belcher*, 404 U.S. 78, 80-81 (1971) (noting "the power of Congress to make substantive changes" to benefits programs such as risk corridors); *Kizas v. Webster*, 707 F.2d 524, 539 (D.C. Cir. 1983) (government benefits "are 'limited, as a general rule, by the governmental power to remove, through prescribed procedures, the underlying source of those benefits.'") (citations omitted, emphasis removed).

Congress has done so here. Accordingly, the case must be dismissed for failure to state a claim upon which relief may be granted.

**CONCLUSION**

Based upon the foregoing, the Court should dismiss CHO's Complaint, deny CHO's motion for summary judgment, and enter judgment for the United States.

Dated: January 13, 2017

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

RUTH A. HARVEY
Director
Commercial Litigation Branch

KIRK T. MANHARDT
Deputy Director

/s/ Serena M. Orloff
SERENA M. ORLOFF
MARC S. SACKS
CHARLES E. CANTER
TERRANCE A. MEBANE
FRANCES M. MCLAUGHLIN
L. MISHA PREHEIM
PHILLIP M. SELIGMAN
Commercial Litigation Branch
Civil Division

United States Department of Justice
P.O. Box 875
Ben Franklin Station
Washington D.C. 20044
Tel. (202) 616-3619
Fax (202) 514-9163
serena.m.orloff@usdoj.gov

ATTORNEYS FOR THE UNITED STATES

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 13, 2017, I electronically filed the foregoing UNITED STATES' MOTION TO DISMISS AND OPPOSITION TO CHO'S MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

/s/ Serena M. Orloff
SERENA M. ORLOFF
Commercial Litigation Branch
Civil Division
United States Department of Justice