# In the United States Court of Federal Claims

No. 16-967C
(Filed: July 31, 2017)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| MAINE COMMUNITY HEALTH OPTIONS, | |
| *Plaintiff,* | Money mandating statute; Affordable Care Act; Risk Corridors Program; 42 U.S.C. § 18062; Appropriations riders; Limitation on use of funds. |
| v. | |
| THE UNITED STATES, | |
| *Defendant.* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Stephen McBrady*, Washington, DC, for plaintiff. *Daniel Wolff* and *Xavier Baker*, of counsel.

*Marc S. Sacks,* United States Department of Justice*,* Commercial Litigation Branch, Civil Division, Washington, DC, for defendant. *Charles E. Canter*, *Terrance A. Mebane*, *Frances M. McLaughlin*, *L. Misha Preheim*, and *Phillip M. Seligman*, of counsel.  Also on the briefs were *Chad A. Readler*, Acting Assistant Attorney General*, Ruth A. Harvey*, Director, *Kirk T. Manhardt*, Deputy Director.

OPINION

BRUGGINK, *Judge.*

This is a claim for statutory entitlement to payment under the "Risk Corridors Program" ("RCP") created by section 1342 of the Affordable Care Act ("ACA"), codified at 42 U.S.C. § 18062 (2012) ("section 1342"). The RCP is in essence a program in which insurers, and potentially the government, share both the risk and reward inherent in setting plan premiums. Plaintiff, Maine Community Health Options ("CHO") is a non-profit corporation with its principal place of business in Lewiston, Maine.

It provides health insurance to its members under the federally-facilitated market place in Maine and New Hampshire. CHO is approved by the Centers for Medicare and Medicaid Services ("CMS") to offer qualified health care plans ("QHPs"). Plaintiff alleges that it is owed but has not been paid approximately $23 million under the RCP program for program years 2014 and 2015. CHO filed a motion for summary judgment on November 3, 2016. Defendant filed its opposition and moved for dismissal under Rules 12(b)(1) and 12(b)(6) on January 13, 2017. In an order dated March 9, 2017, we denied defendant's motion to dismiss for lack of jurisdiction and ripeness and preserved the remaining issues raised in plaintiff's motion for summary judgment and defendant's motion to dismiss for failure to state a claim. We also asked for additional targeted briefing. That briefing is complete. Supplemental oral argument was heard on July 24, 2017.

We conclude that Congress timely barred the use of appropriated funds to pay any amounts due under the RCP program beyond those collected from participating health care insurers. That conclusion makes it unnecessary to pursue defendant's alternative argument that the statute cannot be construed to make the government a guarantor of deficiencies in collections under the risk corridors program.

BACKGROUND

The general way in which the program operates is that insurers whose costs for a calendar year exceed a target amount are entitled to a payment to partially recoup those expenses. Insurers whose costs are below the target amount pay a percentage of that delta into the program. The target amount is set with regard to the premiums established for each year. In this way, all participating insurers share in the risk and reward of setting premiums too high or too low. This lawsuit poses the question of whether the government has obligated itself to share in the risk by making up the difference when payments into the program fail to satisfy the amounts owed to insurers whose costs exceed the target.

There is only one count in the complaint: "Violation of Statutory and Regulatory Mandate to Make Payments." Plaintiff moved for summary judgment on that count, arguing that section 1342 mandates payment by the Department of Health and Human Services ("HHS") on a yearly basis if qualifying costs exceed a certain amount, and it is undisputed that plaintiff's costs did exceed that amount in the years 2014 and 2015.[1]

---

[1] Although the RCP applies to calendar years 2014, 2015, and 2016, any

Defendant does not dispute that the amounts plaintiff calculated on a yearly basis are correct. Instead it moves for dismissal for failure to state a claim for two legal reasons. First, defendant argues that Congress intended the RCP to be "budget neutral," meaning that section 1342 limits the government's payment obligations to the amounts collected from insurers whose costs are below the target amount and who therefore have paid into the RCP. If HHS collects less from insurers who must pay into the program than it owes to insurers who are due payment, then, according to defendant, the government is under no obligation to make up the difference with other funding sources. In sum, while section 1342 mandates the payment of money by HHS, that obligation is limited to the fees collected by the program.  There is no underwriting by the government of deficits generated by the program.

Defendant's second and independent argument is that, even if the statutory language of the RCP provisions is construed to create an open-ended obligation on the part of the federal government to make up the deficits in the operation of the risk corridors, Congress timely barred the use of any appropriated funds other than fees collected in appropriations riders in 2014 and 2015 and that expression of congressional intent trumps any different obligation arguably created by section 1342.

In response, plaintiff asserts that Congress' failure to amend or repeal the RCP reflects that it was not intended to be budget neutral when it was originally passed and remains so today. Plaintiff also argues that the appropriations riders were not effective to limit the government's liability under the statute because section 1342 had already created an obligation before the riders were passed. Plaintiff urges that the riders should not be read to have retrospective effect.

Four other judges of this court have considered these and similar arguments. All found jurisdiction and that the claims were not premature. *Blue Cross & Blue Shield of N.C. v. United States*, 131 Fed. Cl. 457 (2017); *Moda Health Plan, Inc. v. United States*, 130 Fed. Cl. 436 (2017); *Health Republic Ins. Co. v. United States*, 129 Fed. Cl. 757 (2016); *Land of Lincoln Mut. Health Ins. Co. v. United States*, 129 Fed. Cl. 81 (2016).

---

payment due for 2016 would not be calculated until July 2017, thus it could not have been included in the complaint.

Three of the judges went on to address the merits of insurers' claims and the government's defense of failure to state a claim. Two judges arrived at a different conclusion than the third. *Compare Land of Lincoln*, 129 Fed. Cl. at 108 (holding that the statute was ambiguous and deferring to the agency's interpretation that payments need neither be made yearly nor in any amount over what HHS collects under the program), *and Blue Cross*, 131 Fed. Cl. at 475 (holding that the plain language of the statute and regulation do not create an annual deadline to make RCP payments), *with Moda*, 130 Fed. Cl. at 455, 460-65 (holding, *inter alia*, that the statute is not budget-neutral and that the appropriations riders did not vitiate HHS' yearly payment obligation). Here, we have already held that section 1342 is money mandating, although we preserved defendant's contention that the mandate is capped by fees received. *See Maine Cmty. Health Options v. United States*, No. 16-967C (Fed. Cl. Mar. 9, 2017) (order denying Def.'s Mot. to Dismiss for lack of jurisdiction).

## I.  LEGISLATIVE HISTORY

We begin with some of the legislative history of the act, which is illustrative of the history of the particular provisions at issue. On September 17, 2009, the Senate Committee on Health, Education, Labor, and Pensions reported its version of the ACA to the floor. S. 1679, 111th Cong. § 142. This version included an express provision that authorized HHS to use money in the Treasury for RCP payments to QHP issuers.[2] Over a month later, the Senate Committee on Finance subsequently reported its own version of the legislation. S. 1796, 111th Cong. § 1001 (2009). This version contained no reference to funding the RCP and modeled more closely the language eventually adopted in section 1342 of the ACA. *Id.*

Once the final draft of the ACA was prepared, the Congressional Budget Office ("CBO") released its budget scoring on March 20, 2010, notably omitting the RCP from the scoring and attributing no expenses to it. Letter from Douglas W. Elmendorf, Director, Cong. Budget Office, to Nancy Pelosi, Speaker, House of Representatives, Tbl. 2 (March 20, 2010).

---

[2] "(B) FUNDING.—There is hereby appropriated to the Start-Up Fund, out of any moneys in the Treasury not otherwise appropriated an amount requested by the Secretary of Health and Human Services as necessary to— . . . (iii) make payments under paragraph (3)." S.1679 § 3106(c)(1)(B). Paragraph 3 would have created a risk corridor program.

Congress relied on the CBO's report in passing the ACA, as stated in the legislation itself, "(1) [b]ased on . . . (CBO) estimates, this Act will reduce the Federal deficit between 2010 and 2019. (2) CBO projects this Act will continue to reduce budget deficits after 2019." Pub. L. No. 111-148, § 1563(a), 124 Stat. 270; *see also Land of Lincoln*, 129 Fed. Cl. at 104.

On March 23, 2010, the ACA became law, including section 1342, which states:

> (a) In general.
>
> The Secretary shall establish and administer a program of risk corridors for calendar years 2014, 2015, and 2016 under which a qualified health plan offered in the individual or small group market shall participate in a payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums. Such program shall be based on the program for regional participating provider organizations under part D of title XVIII of the Social Security Act [42 USCS §§ 1395w-101 et seq.].
>
> (b) Payment methodology.
>
> (1) Payments out. The Secretary shall provide under the program established under subsection (a) that if--
>> (A) a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and
>> (B) a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.
>
> (2) Payments in. The Secretary shall provide under the program established under subsection (a) that if--

(A) a participating plan's allowable costs for any plan year are less than 97 percent but not less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to 50 percent of the excess of 97 percent of the target amount over the allowable costs; and

(B) a participating plan's allowable costs for any plan year are less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the excess of 92 percent of the target amount over the allowable costs.

42 U.S.C. § 18062. The statute is silent here and elsewhere as to funding for the payments out other than the implication that the payments in could be used in that manner.

## II.  REGULATORY FRAMEWORK

The details of how the RCP would be administered and when payments were due or would be made were largely left to HHS.  It published a final payment rule on March 23, 2012, stating in relevant part:

(a) General requirement. A QHP issuer must adhere to the requirements set by HHS in this subpart and in the annual HHS notice of benefit and payment parameters for the establishment and administration of a program of risk corridors for calendar years 2014, 2015, and 2016.

(b) HHS payments to health insurance issuers. QHP issuers will receive payment from HHS in the following amounts, under the following circumstances:

(1) When a QHP's allowable costs for any benefit year are more than 103 percent but not more than 108 percent of the target amount, HHS will pay the QHP issuer an amount equal to 50 percent of the allowable costs in excess of 103 percent of the target amount; and

(2) When a QHP's allowable costs for any benefit year are more than 108 percent of the target amount, HHS

will pay to the QHP issuer an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

(c) Health insurance issuers' remittance of charges. QHP issuers must remit charges to HHS in the following amounts, under the following circumstances:

(1) If a QHP's allowable costs for any benefit year are less than 97 percent but not less than 92 percent of the target amount, the QHP issuer must remit charges to HHS in an amount equal to 50 percent of the difference between 97 percent of the target amount and the allowable costs; and

(2) When a QHP's allowable costs for any benefit year are less than 92 percent of the target amount, the QHP issuer must remit charges to HHS in an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the difference between 92 percent of the target amount and the allowable costs.

(d) Charge submission deadline. A QHP issuer must remit charges to HHS within 30 days after notification of such charges.

45 C.F.R. § 153.510 (2012); 78 Fed. Reg. 15,410, 15,531 (Mar. 11, 2013) (adding subsection (d)).  At the same time, HHS also published an impact analysis of the new regulation. 77 Fed. Reg. 17,220, 17,243 (Mar. 23, 2012). It stated:

CBO estimates that risk adjustment payments and collections are equal in the aggregate . . . . CBO did not score the impact of the risk corridors program, but assumed collections would equal payments to plans in the aggregate. The payments and receipts in risk adjustment and reinsurance are financial transfers between issuers and the entities running those programs.

*Id.* At 17,244.

III.  AGENCY ACTION

The seemingly definitive statement notwithstanding, in the years following the adoption of its final rule, HHS took less-than-consistent positions with respect to whether the RCP would be implemented in a budget-neutral manner. During the comment and answer period for the 2013 final rule, HHS stated that "[t]he risk corridors program is not statutorily required to be budget neutral. Regardless of the balance of payments and receipts, HHS will remit payments as required under section 1342 of the Affordable Care Act." 78 Fed. Reg. at 15,473. Later, however, in its 2015 payment rule comment and answer, HHS stated it "intend[ed] to implement [RCP] in a budget neutral manner, and may make future adjustments, either upward or downward to this program (for example, . . . [HHS] may modify the ceiling on allowable administrative costs) to the extent necessary to achieve this goal." 79 Fed. Reg. 13,744, 13,787 (Mar. 11, 2014). One month later, HHS issued a bulletin outlining a pro rata approach for "payments out" if the "payments in" were not sufficient and promising that it would issue further guidance on risk corridor payments if the collections did not cover them entirely at the conclusion of the three-year program. Pl.'s Mot. Summ. J. Addendum A Doc. 5. HHS confirmed on two other separate occasions its intent for the RCP to be budget neutral over the course of the three-year program; yet it simultaneously recognized that, if there is a shortfall, "the Affordable Care Act requires the Secretary to make full payments to issuers," and "HHS will use other sources of funding for the risk corridors payments, subject to the availability of appropriations." 79 Fed. Reg. 30,240, 30,260 (May 27, 2014); 80 Fed. Reg. 10,750, 10,779 (Feb. 27, 2015).

On October 1, 2015, HHS announced that it would only be able to pay 12.6% of amounts due for 2014 due to lower payments in than requested payments out. Approximately one month later, HHS communicated that it owed $241,717 to CHO, but would only be paying the pro-rated amount of $30,499.53. On the same day, however, HHS also informed QHP issuers that all unfulfilled payments out for the RCP were required to be paid in full and would be treated as fiscal year 2015 obligations for the government. The following year, HHS notified QHP issuers that it would allocate the full amount of collections for benefit year 2015 toward benefit year 2014 payments and use benefit year 2016 collections to satisfy everything that remained, although it concluded that any outstanding payments at the end of the three-year program would be

"subject to the availability of appropriations." Pl.'s Mot. Summ. J. Addendum A Doc. 11.

In summary, HHS has attempted to maintain the general position that the RCP is not statutorily required to be budget neutral, but that HHS intended to implement it in a budget neutral manner. According to its interpretation, any additional payments owed but not covered by the RCP would be paid subject to the availability of appropriations.

## IV. APPROPRIATIONS RIDERS

Both parties acknowledge that the chronology of events is especially critical, particularly pertaining to the appropriations riders. As CHO noted and the government agreed, the earliest possible HHS payments to QHP issuers could not occur before July 2015, when plaintiff submitted its cost information for benefit year 2014 to HHS. *See* Oral Arg. Tr. 54-55 (Feb. 15, 2017); Def.'s Suppl. Br. 8. HHS set a deadline of July 31, 2015 for insurers to submit premium and cost data for the preceding calendar year to HHS, and it set a deadline of August 1, 2016, for the 2015 calendar year. It began making payments for the proceeding years in December of 2015 and 2016.

In February 2014, prior to any plan data and payments, Congress asked the Government Accountability Office ("GAO") to determine what sources of funding would be available when RCP payments were due to QHP issuers. *U.S. Gov't Accountability Office, GAO Op. B-325630, Department of Health and Human Services--Risk Corridor Program* 1 (2014). GAO responded that the CMS Program Management ("PM") appropriation, essentially the operating budget, and "user fees" (RCP collections) could be used to make payments, but only if the appropriations from fiscal year 2014 were re-enacted.[3] *Id.* at 4-5. The GAO report did not mention any other sources of funding as available to the program.

On December 16, 2014, Congress adopted an appropriation for fiscal

---

[3] Re-enactment was required because "[a]n appropriation in a regular, annual appropriation law may be construed to be permanent or available continuously only if the appropriation . . . expressly provides that it is available after the fiscal year covered by the law in which it exists." 31 U.S.C. § 1301(c) (2012). This appropriation did not expressly provide such an availability.

year 2015. Beyond deciding not to adopt the same language as the previous year, Congress affirmatively prevented CMS Program Management funds from being used to satisfy an obligations under the RCP. The appropriation states:

> None of the funds made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the "Centers for Medicare and Medicaid Services--Program Management" account, may be used for payments under section 1342(b)(1) of Public Law 111-148 (relating to risk corridors).

Consolidated and Furthering Continuing Appropriations Act 2015, Pub. L. No. 113-235, div. G, title II, § 227, 128 Stat. 2130, 2491 (2014). The Chairman of the House Committee on Appropriations explained the reasoning behind this measure:

> In 2014, HHS issued a regulation stating that the risk corridor program will be budget neutral, meaning that the federal government will never pay out more than it collects from issuers over the three year period risk corridors are in effect. The agreement includes new bill language to prevent the CMS Program Management appropriation account from being used to support risk corridors payments.

160 Cong. Rec. H9838 (daily ed. Dec.11, 2014). Congress thus expressly barred the use of appropriated funds for RCP payments and implicitly limited HHS to user fees funds to satisfy RCP payments.

Congress adopted an identical appropriation limitation the following year, which further included the following:

> In addition to the amounts otherwise available for "Centers for Medicare and Medicaid Services, Program Management", the Secretary of Health and Human Services may transfer up to $305,000,000 to such account from the Federal Hospital Insurance Trust Fund and the Federal Supplementary Medical Insurance Trust Fund to support program management activity related to the Medicare Program: *Provided*, that

> except for the foregoing purpose, such funds may not be used
> to support any provision of Public Law 111–148 or Public
> Law 111–152 (or any amendment made by either such Public
> Law) or to supplant any other amounts within such account.

Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. H, title II, §§ 225-226, 129 Stat. 2242, 2624-25 (2015).  The import is that extra funds appropriated to Medicare's operating budget could not be used to meet other obligations created by the ACA, such as the RCP.  Similar to the year before, a Senate Committee Report detailed that this appropriation rider was aimed at protecting discretionary funds (operating funds) from being used for RCP payments because that was never their intended purpose. S. Rep. No. 114-74, at 12 (2015).

## DISCUSSION

Insofar as relevant here, the Tucker Act gives this court jurisdiction to hear claims for money against the United States founded upon any Act of Congress or any regulation.   28 U.S.C. §1491(a)(1) (2012).   As the Supreme Court has made clear, however, the Tucker Act is merely jurisdictional; it is not a grant of substantive rights.  *United States v. Testan*, 424 U.S. 392, 398 (1976). A successful plaintiff must point to a source in substantive law that creates liability.   "[A] waiver of the traditional sovereign immunity 'cannot be implied but must be unequivocally expressed,'" *Id.* at 953-54 (citing *United States v. King*, 395 U.S. 1, 4 (1969)).

## I.  Statutory Interpretation

Plaintiff believes that this court's inquiry begins, and more importantly, ends with the text of section 1342's payment out provision, which states:

> (1) Payments out. The Secretary shall provide under the
> program established under subsection (a) that if–
>
> > (A) a participating plan's allowable costs for any plan
> > year are more than 103 percent but not more than 108
> > percent of the target amount, *the Secretary shall pay* to
> > the plan an amount equal to 50 percent of the target

> amount in excess of 103 percent of the target amount; and
>
> (B) a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, *the Secretary shall pay* to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

42 U.S.C. § 18062(b) (emphasis supplied).  The use of "shall pay" creates an enforceable obligation, according to plaintiff.

As we held previously, there is no question that the statute commands payment of money by the Secretary. Thus the court has jurisdiction to decide whether plaintiff is entitled to payment, but whether the government's payment obligation is limited in some way by other provisions or by subsequent legislation remains unanswered by the language quoted above.  The government urges that it is limited by both. The question generally stated then is whether the RCP contemplates merely a divvying up of fees received or if the Treasury is obligated to make up any difference. Defendant urges that Congress did not intend to obligate any payment of money beyond what is collected under the program and that, in any event, it expressly limited the funds available to make RCP payments in appropriation legislation. We do not reach the first issue because the answer to the second question is clear.  Congress controls the purse. Within certain limitations, which we find not to be relevant here, it has the right to nullify what would otherwise appear to be binding commitments, and it did so here.

## II.  Statutory Amendment Via Appropriation

We hold that Congress clearly and timely expressed its intention that public funds not be used to pay deficiencies arising under section 1342, at least for fiscal years 2015 and 2016. While the application of this fact is complicated in part by the lack of symmetry between the program years, which operate on a calendar basis, and fiscal years, which run from October 1 to September 30, it is undisputed that the appropriations riders at issue were adopted prior to what we view as the key dates: the end of benefit year 2014 and the end of benefit year 2015. We are thus not confronted with a

situation in which the interdict comes after the entitlement is fixed.[4]

We begin with the proposition that Congress' power to spend, or not, is unimpeded by its earlier actions. This axiom of federal law has consequences as applied to the interplay between substantive legislation, such as the ACA, and the appropriations needed to fund it. The relevant principles are drawn from a few key decisions of the Supreme Court.

In *United States v. Mitchell*, 109 U.S. 146 (1883), an Indian interpreter for the Secretary of the Interior claimed he had not been paid his statutory salary. Congress had in 1834 dictated a salary of $400 per year. Yet Mr. Mitchell, who worked between 1878 and 1882, had been paid only $300 per year. Beginning in 1877, Congress had, in its annual appropriations for Indian affairs, specifically limited salaries for individuals like Mr. Mitchell to $300 per year. The Court observed the following:

> We find, therefore, this state of legislation: by the Revised Statutes, the salaries of interpreters were fixed . . . at $400 . . . . By the acts in force during the appellee's term of service, the appropriation for the annual pay of interpreters was $300 each, and a large sum was set apart for their additional compensation, to be distributed by the Secretary of the Interior at his discretion.
>
> This course of legislation . . . distinctly reveals a change in the policy of Congress on this subject–namely that instead of establishing a salary for interpreters at a fixed amount and cutting off all other emoluments and allowances, Congress intended to reduce the salaries and place a fund at the disposal of the Secretary of the Interior.

*Id.* at 149.

The Court noted that it did not have before it a simple case of a failure to appropriate sufficient funds to cover an obligation: "On the contrary, in this case Congress has in other ways expressed its purpose to reduce for the time being the salaries of interpreters." *Id* at 150. The court found that his salary was fixed by the subsequent appropriation acts and not

---

[4] Thus plaintiff's concerns regarding retroactivity are not implicated.

the earlier 1834 act.

A similar result obtained in *United States v. Dickerson*, 310 U.S. 554 (1940). Congress in 1922 had authorized the payment of an enlistment bonus to every soldier who re-enlisted within three months after the date of his discharge. The plaintiff had been honorably discharged at the termination of his enlistment in July 1938. He re-enlisted one day later. He was denied a bonus, however, because in June 1938 Congress, in a resolution appended to an appropriations bill, directed that no part of any appropriation for the fiscal year ending June 30, 1939, could be used to pay re-enlistment bonuses, "notwithstanding" the prior statute. *Id.* at 555. The Court of Claims ruled in favor of the soldier, on the grounds that the prior legislation had not been repealed. The Supreme Court reversed. It held that "[t]here can be no doubt that Congress could suspend or repeal the authorization contained in Section 9, and it could accomplish its purpose by an amendment to an appropriation bill, or otherwise." *Id.* (citing *Mitchell*, 109 U.S. at 150). Because of sloppy legislative drafting, the Court was confronted with the argument that the resolution was not phrased in a clear enough manner to warrant setting aside the bonus. A review of the legislative history of the provision persuaded the Court that Congress' intent was clear.

Although it involved application of the Compensation Clause of Article III, § 1, *United States v. Will*, 449 U.S. 200 (1980), also assists the government here. The primary question there was whether Congress had timely intercepted judicial pay raises before they took effect at the beginning of four different calendar years. While the protection afforded by the Compensation Clause is not relevant here, the Court's observations about how to implement subsequent appropriations limitations if they undercut substantive provisions offer us guidance. Although repeals by implication are disfavored, particularly if they arise in appropriations legislation, Congress can suspend or repeal a statute in force by an amendment to appropriations bill. *Id.* at 222 (citing *Mitchell*, 109 U.S. at 150). The "whole question depends on the intention of Congress as expressed in the statutes." *Id.* Because Congress' intent in *Will* was unmistakable, the only limitation on its power to reverse the pay increases was the Compensation Clause, which only applied in two of the years at issue; "[t]o say that Congress could not alter a method of calculating salaries before it was executed would mean the Judicial Branch could command Congress to carry out an announced future intent as to a decision

14

the Constitution vest exclusively in the Congress." *Id.* at 228.

These three cases establish that Congress can effect a change to a substantive obligation that was earlier created through language in subsequent appropriations legislation. Thus the "shall pay" language of section 1342 is not dispositive in the face of two appropriations riders that limit the sources of funding for that obligation. We must therefore parse those appropriations to answer the question.

III.  The Effect Of The Appropriations Legislation

Given that section 1342's payments in and payments out are accounted for on a yearly basis, the amount owed by or owed to an insurer in the RCP cannot be known until the end of the plan year after all of the expenses for that year are accounted for. The plan years correspond to calendar years. Thus the government's liability to any particular insurer for a particular year cannot be known until the last day of that calendar year.[5]

Congress passed the two relevant appropriations provisions in December of 2014 and 2015. The 2014 bill applies by its terms to fiscal year 2015, and the 2015 bill applies to fiscal year 2016. The government's fiscal year begins in October of the preceding calendar year. Thus, for the 2014 plan year (calendar year), even assuming that payment could be made as soon as costs were completely fixed on the final day of the year, any federal funds necessary to make RCP payments would come from 2015 fiscal year funds.  The same is true for the following year (2015 payments could only be made from fiscal year 2016 funds). Thus we find that Congress timely intercepted its RCP obligations in those years by passing the appropriations provisions in December of each year.

Obligation necessarily precedes payment, and the obligation here matured at the end of benefit year 2014. This is because HHS was required to collect an entire year of data before compiling the information and determining RCP payment amounts. *See* 42 U.S.C. § 18062; 45 C.F.R. § 153.510. Once the benefit year concluded, the data was theoretically final, needing only to be reported and interpreted to ascertain what obligations

---

[5] Or perhaps even beyond that date since, as defendant pointed out during oral argument, insurance claims are regularly submitted for a plan year during the first few months of a subsequent year.

existed within the RCP.

The effect of these riders was to prevent HHS from using its CMS operating fund to meet any government liability created by the RCP. This left HHS with only the user fees as available to make RCP payments. Plaintiff has not suggested an alternative source of funding for these payments, and we think for good reason. Other federal funds available to HHS are specifically set aside to pay benefits under Medicare and Medicaid. In order to touch those pools of money, Congress must expressly direct some other use for those funds. Plaintiff argues instead, citing several Court of Claims decisions, that the source of the funding is immaterial once the obligation is created. The Judgment Fund can be used to make up a shortfall, posits plaintiff. As we explained earlier, however, the law in this regard is not so simple. Congress can limit or forestall the payment of obligations it has earlier created through subsequent legislation, even by means of appropriations legislation.

The decisions of the Court of Claims and the Federal Circuit are largely consistent. Although the result in *Norcross v. United States*, 142 Ct. Cl. 763 (1958), was favorable to the complainant, the court's reasoning does not dictate the result plaintiff wishes for here. A congressman had employed a clerk in his office, unaware that she was an Austrian citizen. Congress had adopted in 1952 an appropriations rider that placed limits, during that fiscal year, on hiring foreign nationals. Plaintiff had been employed in February 1952. The case was not heard until 1958, a year in which, as Judge Jones noted, the limitations no longer had effect because, "the restriction does not apply to funds appropriated by a subsequent Congress, unless the restriction were again attached," which it was not. He then helpfully suggested to his former colleagues in Congress that there was no reason "why a subsequent Congress may not pay the reasonable value of services actually rendered even though the funds of the 1952 appropriation act could not be used."[6] *Id.* at 766. Despite the creative result, the point remains that Congress' subsequent directions, expressed even in appropriations riders, can control prior promises.

Another opinion by Judge Jones, *Gibney v. United States*, 114 Ct.

---

[6] Judge Jones acknowledged "some difference of opinion" as to his reasoning, but noted, citing scripture, that the court agreed she should be paid. *Id.* at 767.

Cl. 38 (1949), dealt with an attempt to limit the government's liability for overtime pay. The legislative restriction provided that "none of the funds appropriated for the Immigration and Naturalization Service shall be used to pay compensation for overtime services other than as provided  in the Federal Employees Pay Act of 1945." *Id.* at 48-49. In ruling for the employee, Judge Jones explained that

> The judgment of a court has nothing to do with the means--with the remedy for satisfying a judgment. It is the business of courts to render judgments, leaving to Congress and the executive officers the duty of satisfying them. Neither is a public officer's right to his legal salary dependent upon an appropriation to pay it. Whether it is to be paid out of one appropriation or out of another; whether Congress appropriate an insufficient amount, or a sufficient amount, or nothing at all, are questions which are vital for the accounting officers, but which do not enter into the consideration of a case in the courts.

*Id.* at 52. The court explained that "a pure limitation on an appropriation bill does not have the effect of either repealing or even suspending an existing statutory obligation any more than the failure to pay a note in the year in which it was due would cancel the obligation stipulated in the note." *Id.* at 50-51. Judge Jones distinguished *Dickerson* by explaining that, unlike the legislation in *Gibney,* which it viewed as strictly a limitation on the use of particular funds for a particular year, the history of the legislation in *Dickerson* demonstrated a clear intent to suspend the legislative authorization. In the case at bar, it is precisely the demonstrated clear Congressional intent that prevents the payment of federal funds to make RCP payments.

The Federal Circuit has had occasion twice to address Congress' dealings with "payments in lieu of taxes." The first was *Highland Falls-Fort Montgomery Central School District v. United States,* 48 F.3d 1166 (Fed. Cir. 1995). There the court noted that Congress had, beginning in 1950, continually re-authorized a program of compensating local school districts for the loss of property tax revenue due to the presence of large federal military installations. The statute provided that, "the local educational agency shall be entitled to receive for such fiscal year such amount as, in the judgment of the Secretary [of Education], is equal to the

[financial burden imposed.]" 20 U.S.C. § 237(a)(2) (1988 & Supp. V 1993) (repealed 1994). There were other provisions that provided subsidies under other, related circumstances. The statute recognized, however, the possibility that appropriations might be insufficient to fully fund all the eligible recipients under any of the applicable provisions. In that case, a recipient under section 237 was not only given priority, it was assured "100 percentum of the amount to which it is entitled as computed under that section." *Id.* § 240(c) (repealed 1994). Despite that provision, from 1989 to 1993, Congress did not appropriate sufficient funds to fully fund the program, and it further capped the amount payable to section 237 recipients at $15 million. The Department of Education followed those appropriation restrictions rather than the language of section 240.

The Federal Circuit endorsed DOE's approach:

[W]e have great difficulty imagining a more direct statement of congressional intent than the instructions in the appropriations statutes at issue here. For example, the appropriation statue for fiscal year 1989 stated: "$15,000,000 shall be for entitlements under section 2 [Sec. 237] of said Act."

*Highland Falls*, 48 F.3d at 1170.

Moreover, the circuit court relied on two statutory provisions which it viewed as controlling. 31 U.S.C. § 1341(a)(1)(A) (2012) provides that "[a]n officer or employee of the United States Government . . . may not . . . make or authorize an expenditure . . . exceeding an amount available in an appropriation . . . for the expenditure." Also, 31 U.S.C. § 1532 states that an "amount available under law may be withdrawn from one appropriation account and credited to another . . . only when authorized by law." In other words, an agency may not spend more money than Congress authorizes for it to use on a particular program, nor may it cannibalize one reticule to supplement another.

In *Prairie County v. United States,* 782 F.3d 685 (2015), the Federal Circuit had occasion to revisit the payment in lieu program. It recognized that "[i]t has long been established that the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat

a Government obligation created by statute." *Id.* at 689 (quoting *N.Y. Airways v. United States*, 369 F.2d 743, 748 (Ct. Cl. 1966)).[7] Nevertheless, the court in *Prairie County* noted that Congress had spoken clearly when it wrote in 31 U.S.C. § 6906 that, "notwithstanding any other provision of this chapter no funds may be made available except to the extent provided in advance in appropriation Acts." 782 F.3d at 690.

In *Prairie County* the court distinguished several cases cited by plaintiff in this cases: *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182 (2012), and *Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631 (2005). As the *Prairie County* court stated, where a government contract obligation exists, the government may be compelled to pay more than it originally appropriated. 782 F.3d at 687. This differs, however, from cases involving a benefits program because "there is greater room in benefits programs to find the government's liability limited to the amount appropriated." *Id.* at 689 (quoting *Greenlee County v. United States*, 487 F.3d 871, 879 (Fed. Cir. 2007)). Accordingly, *Ramah* and *Leavitt* are not controlling and the court's reasoning in *Prairie County* aligns with how we view similar precedent here.

Further, we agree with defendant that *Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011), and *United States v. Langston*, 118 U.S. 389 (1886), do not lead to a different result. *Slattery* involved a contract claim against a non-appropriated fund instrumentality, and the court was presented with a question of jurisdiction. While it is true that the absence of general appropriations supporting the Federal Deposit Insurance Corporation did not deter the Federal Circuit from finding jurisdiction and potential liability, the court did not speak to the issue relevant here. In the present action, the remaining question is not the court's jurisdiction to hear money claims, the agency involved is not a non-appropriated fund instrumentality, and, most relevant for our purposes, the claim is not for breach of contract. As we discussed above, the Court has developed a different approach in judging Congress' ability to use appropriations limitations to bar recoveries in the case of statutory "benefits" as distinct

---

[7] We view it as telling, as well, that despite the statutory basis for the airlines' claims in *N.Y. Airways*, the court described Congress's own view that the obligations were more in the nature of contracts. *See* 369 F.2d at 747.

from contract claims.[8]

*Langston* dealt with the salary of America's ambassador to Haiti. By statute the ambassador's salary had been pegged at $7,500, and that amount had been specifically appropriated for that purpose for several years. The annual appropriations included the statement that the appropriation "shall be in full for the annual salaries thereof from and after July 1, 1878." *Langston*, 118 U.S. at 390. Beginning in 1882, however, this language was omitted and the appropriation was for only $5,000. The Court sustained the ambassador's claim for the differential in pay, despite the absence of an appropriation for the full amount because of the earlier language indicating that the $7,500 salary should continue beyond 1878, and also because the later statute did not purport to cap his pay at $5,000:

> [A] statute fixing the annual salary of a public officer at a named sum, without limitation as to time, should not be deemed abrogated or suspended by subsequent enactments which merely appropriated a less amount for the services of that officer for particular fiscal years, and which contained no words that expressly, or by clear implication, modified or repealed the previous law.

*Langston*, 118 U.S. at 394. The specificity of the earlier promise, in short, was not overcome by a later appropriation short of the promised amount.

The present facts offer a reverse scenario. The language of entitlement is not specific with respect to Congress's intent to appropriate, but its subsequent language disavowing any such obligation is clear.

Finally, also relevant is the Federal Circuit's decision in *Star-Glo Assocs., LP v. United States*, 414 F.3d 1349 (Fed. Cir. 2005). There, Congress had established a program to be administered by the Department of Agriculture to compensate Florida citrus growers for the compelled

---

[8] The same would be true for breach of trust cases, and constitutional takings claims wherein government liability is either fixed by the constitution, and thus not subject to appropriations limitations, or by statutorily-created duties that create a fiduciary relationship between the government and some third party, such as Native American tribes.

destruction of diseased trees. The program operated for two years before Congress, in October 2000, adopted an appropriations statute with respect to the fiscal year 2000, which provided that the Secretary of Agriculture "shall use $58,000,000 of the funds of the Commodity Credit Corporation to carry out this section, to remain available until expended." *Id.* at 1352. There is no question that the plaintiff growers complied with the applicable regulations and would have been compensated but for the appropriations cap. The Court of Federal Claims held, despite the fact that plaintiffs had applied for compensation prior to the exhaustion of the appropriated funds, they could not recover because the cap barred further payments. 59 Fed. Cl. 724, 733 (2004). The Federal Circuit affirmed, although on a somewhat different basis. Initially it agreed with the applicability of the cap. Relying on legislative history as well as the language of the appropriations statute, it concluded that there was "no room to doubt that Congress intended benefits available under section 810 to be capped at $58,000,000." *Id.* at 1355.

The plaintiffs in *Star-Glo* argued, however, that the fact that their applications were submitted prior to the exhaustion of funds made the cap irrelevant, and that it made the facts distinguishable from, for example, *Highland-Falls*, where the appropriation had been exhausted prior to the plaintiff seeking additional funds. The circuit court found it unnecessary to reach the question, however, because it ruled that plaintiff did not qualify for any further payments under the terms of the statute. *Id.* at 1357-58.

Although it is difficult to harmonize the decisions in this lengthy history, we believe they lead to following controlling principles. Mere non-appropriation of sufficient funds to meet an existing obligation created by statute[9] will not thwart the courts' enforcement of the obligation. Whether Congress, in subsequent appropriations legislation, can block enforcement of a substantive obligation depends, ultimately, on how clearly it expresses its intent to do so.

These principles dictate the result here. Congress made clear its intention that no public funds be spent to reimburse risk corridor participants beyond their user fee contributions. It asked GAO what monies were available to HHS to make risk corridor payments. GAO answered that user fees and the CMS program management fund were the only sources

---

[9] We recognize that the case law dealing with contractual obligations, the takings clause, or those arising out of Indian trusts, is *sui generis*.

available. Congress expressly blocked the use of the latter, leaving only the former. The government's obligation was thus capped to the amount brought in from user fees. We are not presented with possible exceptions to this outcome. There were no contract commitments and Congress did not merely fail to address the source of funding. It affirmatively barred the use of public funds in a timely manner, predating the maturation of any obligation to make statutory entitlement payments.

We recognize that Judge Wheeler arrived at a different conclusion in *Moda Health* after examining the same cases. We respectfully disagree with his conclusion. He relied heavily on a distinction present in the legislation in *Dickerson* and *Will,* two cases in which appropriation bars were enforced to thwart the implementation of rights arising from substantive legislation. In both cases, Congress had used, in substance, the phrase, "the appropriation in this or any other Act." I.e., Congress was ensuring that the agencies would not subvert its intent by funding the programs at issue from other sources. Not finding that language in the appropriations riders in the present circumstances, he held that they did not limit the substantive obligation created by section 1432. *Moda*, 130 Fed. Cl. At 460-61. We disagree. These appropriations provisions were adopted after Congress inquired of GAO concerning available funding for the RCP payments. Congress was presented with two potential pools of money for RCP payments and clearly eliminated one of them, thus expressly limiting payments to the other pool—user fees. Once those funds were exhausted, the government's liability was capped.

Furthermore, we remain unconvinced by plaintiff's argument that Congress' failure to amend or repeal the RPC indicated that it did not intend the program to be budget neutral. We agree with defendant that it is imprudent to determine Congress' intent based merely upon what it was unable to do. The legislative history of the statute does not lend itself to plaintiff's interpretation. In fact, Congress opted to follow a committee design for section 1342 without an enumerated appropriation, declining to mimic a different committee's design which specifically included an appropriation. *Compare* S. 1796, 111th Cong., *with* S. 1679, 111th Cong. Congress had every opportunity to include an appropriation as it had in other sections of the ACA, *see, e.g.*, 42 U.S.C. §§ 18001(g)(1), 18031(a)(1), 18042(g), 18043(c), 18121(b), and remove any doubt of budget neutrality, but declined to do so. While the CBO's decision to omit any reference to the RCP in the ACA scoring is not dispositive, it does

suggest that plaintiff is incorrect. Plaintiff's position is further hampered in light of the subsequent appropriations riders that explicitly restrict where funding could be obtained after the GAO highlighted which sources may be available. As discussed previously, even if there were a mature obligation, Congress can amend it via appropriations legislation. *See Dickerson*, 310 U.S. at 555. Nonetheless, the actions or inactions of a previous Congress are not binding on a later Congress.

Although we raised the issue of the availability of the Judgment Fund for additional briefing, we conclude that the issue is immaterial. Retreat to the Judgment Fund assumes a liability in the first instance. *See Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 432 (1990). We cannot order the payment of monies out of the Treasury beyond those arising from user fees.

CONCLUSION

Plaintiff's motion for summary judgment is denied. Defendant's motion to dismiss for failure to state a claim is granted. The Clerk is directed to dismiss the complaint and enter judgment accordingly. No costs.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge